ASG INDUSTRIES, INC., PPG Industries, Inc., Libbey-Owens-Ford Company, and C E Glass, Plaintiffs,

v.

UNITED STATES, Defendant.

C.D. 4794; Court No. 77-5-00879.

United States Customs Court.

March 29, 1979.

---

7. The recent decision of Judge Ford of this Court, C.D. 4782, decided January 5, 1979, *appeal pending,* is noted.

Stewart & Ikenson, Washington, D. C. (Eugene L. Stewart and Frederick L. Ikenson, Washington, D. C., of counsel), for plaintiffs.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., David M. Cohen, Branch Director, Joseph I. Liebman, New York City, Atty. in Charge, Field Office for Customs Litigation, John J. Mahon and Sidney N. Weiss, Trial Attys., New York City, for defendant.

MALETZ, Judge:

## Introduction

Plaintiffs are domestic manufacturers and wholesalers of float glass. In 1974 they filed with the Commissioner of Customs a petition under 19 U.S.C. § 1303, alleging that bounties or grants were being paid or bestowed, directly or indirectly, upon the manufacture or production of float glass in Italy or upon the exportation of float glass from Italy. Included among the alleged bounties or grants described in plaintiffs' petition were certain benefits received by float glass manufacturers in Italy under various regional development programs administered by the Italian Government, including investment grants, low-interest rate financing, and the reduction of the contribution to state welfare organizations by the float glass manufacturers. These benefits were more than *de minimis*, and were paid in respect of expenditures incurred by float glass producers in the creation or expansion of float glass production facilities in certain regions of Italy.

Thereupon, the Secretary of the Treasury conducted an investigation and published, on July 3, 1975, a "Notice of Preliminary Countervailing Duty Determination" in the Federal Register which read in part (40 Fed.Reg. 28105):

> On the basis of an investigation conducted pursuant to § 159.47(c) Customs regulations (19 C.F.R. 159.47(c)), it has tentatively been determined that benefits have been received under various programs maintained by the Italian Government. These include Government assistance in the form of investments [sic] grants, low-interest rate financing, and other incentives for facilities located in economically depressed areas, as well as preferential financing available outside the economically depressed areas.
>
> Benefits derived from programs such as those which are the subject of this investigation can, in some circumstances,

constitute bounties or grants within the meaning of the law. Since the information thus far made available concerning these programs has not been sufficient to permit a thorough analysis of their nature and effect, it has been determined preliminarily that imports of float glass from Italy benefit from the payment or bestowal of a bounty or grant directly or indirectly, within the meaning of the [sic] section 303 of the Tariff Act of 1930, as amended, by reason of the incentive programs mentioned above.

Thereafter, an "Amendment to Notices of Preliminary Countervailing Duty Determinations" was published on August 15, 1975 (40 Fed.Reg. 34423), extending the time within which the public could make submissions.

On January 7, 1976, the Treasury Department published in the Federal Register a "Notice of Final Countervailing Duty Determination" which provided (41 Fed.Reg. 1274):

After consideration of all information received, it has been determined that imports of float glass from Societa Italiana Vetro, S.p.A. and Fabbrica Pisana, S.p.A. benefit from the payment or bestowal of bounties or grants within the meaning of section 303 of the Tariff Act of 1930, as amended (19 U.S.C. 1303) by reason of various incentive programs including investment grants, special tax reductions, low-interest rate financing and the reduction of the contribution to state welfare organizations by the float glass manufacturers. It aso [sic] has been determined that float glass produced by Verrera di Vernante, S.p.A. does not benefit from the payment or bestowal of bounties or grants. Accordingly, notice is hereby given that float glass imported directly or indirectly from Italy produced by Societa Italiana Vetro, S.p.A. (SIV) and Fabbrica Pisana, S.p.A. (Pisana), entered or withdrawn from warehouse for consumption on or after January 7, 1976, will be subject to payment of countervailing duties equal to the net amount of any bounty or grant determined or estimated to have

been paid or bestowed. This determination is based on the best information available, since the three firms named above have declined to provide any detailed information' regarding the benefits they have received under these programs.

In accordance with section 303, until further notice the net amount of such bounties or grants under the information presently available has been estimated to be 10% ad valorem for float glass produced by Societa Italiana Vetro, S.p.A. and Fabbrica Pisana, S.p.A. Declarations of the net amount of the bounties or grants ascertained and determined, or estimated, to have been paid, directly or indirectly, upon the manufacture, production, or exportation of float glass from Italy manufactured by SIV and Pisana will be published subsequently in the Federal Register.

Effective on January 7, 1976, and until further notice, upon entry for consumption or withdrawal from warehouse for consumption of such dutiable float glass from Italy manufactured by SIV and Pisana imported directly or indirectly from Italy which benefits from such bounties or grants, there shall be collected, in addition to any other duties estimated or determined to be due, countervailing duties in the amount ascertained in accordance with the above declaration.

The liquidation of all entries for consumption or withdrawals from warehouse for consumption of such dutiable float glass from Italy manufactured by SIV and Pisana imported directly or indirectly from Italy which benefits from such bounties or grants and is subject to the order shall be suspended pending declarations of the net amounts of the bounties or grants paid or bestowed. A deposit of the estimated countervailing duty, in the amount of 10% ad valorem for float glass from Italy manufactured by SIV and Pisana shall be required at the time of entry for consumption or withdrawal from warehouse for consumption.

Following the publication of this countervailing duty determination, the Secretary of

the Treasury or his delegate, without having given any notice to the plaintiffs or to the public, engaged in a series of communications with representatives of the Italian Government to elicit information from the Italian Government which would have enabled the Secretary of the Treasury or his delegate to consider further whether bounties or grants were received by Societa Italiana Vetro, S.p.A. (SIV).

On March 8, 1977, without any advance notice having been given to the plaintiffs or to the public, a notice was published by the Treasury Department in the Federal Register, 42 Fed.Reg. 13016–17, T.D. 77–77, which modified the countervailing duty determination of January 7, 1976, by excluding therefrom float glass from Italy produced by SIV. The notice stated in pertinent part:

> Because SIV and Pisana declined to provide any detailed information prior to the aforementioned determination regarding the benefits each received, the determination was based on the best information available, and the net amount of the bounties or grants was estimated at 10 percent ad valorem for float glass produced by both companies. Effective on January 7, 1976, liquidation was suspended of all entries for consumption or withdrawals from warehouse for consumption of such dutiable float glass produced by SIV and Pisana imported directly or indirectly from Italy which benefits from such bounties or grants.

> Information has now been received with respect to SIV which permits a more complete analysis of the alleged bounties and grants. Under various regional development programs administered by the Government of Italy, it now appears that an investment grant, preferential financing and a reduction in the required contribution to the state welfare organization have been given to SIV. No special tax reductions have been utilized by SIV. The Italian Government has advised the Treasury Department that the benefits received by SIV have the effect of offsetting disadvantages which would discourage SIV from moving to and expanding

in less prosperous regions. Inasmuch as SIV sells a preponderance of its production in the European Community—more than 97 percent in 1975—the level of its exports outside the European Community is a small percentage of its production, and the amount of assistance provided by the government programs to SIV totaled less than three percent of the value of float glass it produced, those benefits are not regarded as bounties or grants within the meaning of section 303 of the Tariff Act of 1930, as amended (19 U.S.C. 1303).

> For the reasons stated above, it is hereby determined that no bounty or grant is being, or has been, paid or bestowed directly or indirectly, upon the manufacture, production or exportation of float glass from Italy produced by Societa Italiana Vetro, S.p.A. within the meaning of section 303, Tariff Act of 1930, as amended (19 U.S.C. 1303), and T.D. 76–9 is hereby modified so as to exclude float glass from Italy produced by SIV.

> Accordingly, it has been ascertained, determined or estimated and hereby declared, that the net amount of the bounty or grant paid or bestowed upon the subject merchandise produced by SIV is 0 percent ad valorem, and no countervailing duties will be collected upon the liquidation of entries of the subject merchandise for consumption or withdrawals from warehouse for consumption for the period January 7, 1976, through the date of publication of this notice in the Federal Register. Furthermore, the order to suspend liquidation of all entries for consumption or withdrawals from warehouse for consumption of the subject merchandise produced by SIV, is hereby revoked.

Pursuant to 19 U.S.C. § 1516(d), plaintiffs, American manufacturers and wholesalers of the same class or kind as the merchandise the subject of the Secretary of the Treasury's negative countervailing duty determination regarding float glass from Italy produced by SIV, filed, on March 25, 1977, a timely notice of their desire to contest that determination. On May 13, 1977, the Secretary of the Treasury caused publi-

cation of plaintiffs' notice to be made in the Federal Register, 42 Fed.Reg. 24347–48 (1977), and on May 31, 1977, plaintiffs instituted the present action.

### The Statutes

The statutes relevant to the action are as follows:

Section 303 of the Tariff Act of 1930, as amended by section 331 of the Trade Act of 1974, 88 Stat. 2049 (19 U.S.C. § 1303):

*Countervailing duties —*

*Levy of countervailing duties.*

(a)(1) Whenever any country, dependency, colony, province, or other subdivision of government, person, partnership, association, cartel, or corporation, shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country, dependency, colony, province, or other political subdivision of government, then upon the importation of such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture or otherwise, there shall be levied and paid, in all such cases, in addition to any duties otherwise imposed, a duty equal to the net amount of such bounty or grant, however the same be paid or bestowed.

   *    *    *    *    *    *

(3) In the case of any imported article or merchandise as to which the Secretary of the Treasury (hereafter in this section referred to as the "Secretary") has not determined whether or not any bounty or grant is being paid or bestowed—

(A) upon the filing of a petition by any person setting forth his belief that a bounty or grant is being paid or bestowed, and the reasons therefor, or

(B) whenever the Secretary concludes, from information presented to him or to any person to whom authority under this section has been delegated, that a formal investigation is warranted into the question of whether a bounty or grant is being paid or bestowed, the Secretary shall initiate a formal investigation to determine whether or not any bounty or grant is being paid or bestowed and shall publish in the Federal Register notice of the initiation of such investigation.

(4) Within six months from the date on which a petition is filed under paragraph (3)(A) or on which notice is published of an investigation initiated under paragraph (3)(B), the Secretary shall make a preliminary determination, and within twelve months from such date shall make a final determination, as to whether or not any bounty or grant is being paid or bestowed.

(5) The Secretary shall from time to time ascertain and determine, or estimate, the net amount of each such bounty or grant, and shall declare the net amount so determined or estimated.

   *    *    *    *    *    *

Section 516 of the Tariff Act of 1930, as amended by section 321(f)(1) of the Trade Act of 1974, 88 Stat. 2048 (19 U.S.C. § 1516):

*Petitions by American Manufacturers, Producers, or Wholesalers* * * *

   *    *    *    *    *    *

(d) *Contest of Secretary's determination that foreign merchandise is not being sold in United States at less than fair value or that bounty or grant is not being paid.*

Within 30 days after a determination by the Secretary—

(1) under section 160 of this title, that a class or kind of foreign merchandise is not being, nor likely to be sold in the United States at less than its fair value, or

(2) under section 1303 of this title that a bounty or grant is not being paid or bestowed,

an American manufacturer, producer, or wholesaler of merchandise of the same class or kind as that described in such determination may file with the Secretary a written notice of a desire to contest such determination. Upon receipt of such notice the Secretary shall cause publication to be made thereof and of such manufacturer's, producer's or wholesaler's desire to contest the determination. Within 30 days after such publication, such manufacturer, producer, or wholesaler may commence an action in the United States Customs Court contesting such determination.

\* \* \* \* \* \*

Section 1582 of Title 28, 28 U.S.C. § 1582 (1970):

Jurisdiction of the Customs Court

\* \* \* \* \* \*

(b) The Customs Court shall have exclusive jurisdiction of civil actions brought by American manufacturers, producers, or wholesalers pursuant to section 516 of the Tariff Act of 1930, as amended.

### Question

The question presented is whether the bestowal by the Italian Government, under various so-called regional development programs, of certain pecuniary benefits, which are more than *de minimis* in magnitude, upon the manufacture or production of float glass in Italy by SIV constitutes the payment or bestowal of bounties or grants within the meaning of section 303 of the Tariff Act of 1930, as amended (19 U.S.C. § 1303).

### The Facts

The essential facts—which are not in dispute—show that the benefits alleged to be bounties or grants in this action were conferred under a regional development program administered by the Italian Government. Italian Law No. 646 of August 10, 1950 established a plan for developing the industry and commerce of southern Italy, known as the Mezzogiorno, which has been economically and socially depressed for centuries. That law was modified by Italian Law No. 853 of October 6, 1971, which provided various programs of economic assistance. Administration and financing of these programs are handled through a number of financial institutions, such as the Cassa per il Mezzogiorno (Cassa), ISVEIMER (Instituto per lo Sviluppo Economica dell'Italia Merdidionale), IRFIS (Instituto Regionale per il Finanziamento alle Industrie in Sicilia), CIS (Credito Industriale Sardo), and the large regional commercial banks.

Through these regional development programs, three types of benefits were provided for a float glass facility SIV established in 1974 in San Salvo, Italy which is located in the Mezzogiorno. These benefits were as follows:

1. *Investment grant.* The Cassa is authorized to make capital grants toward the creation of new industrial establishments. The size of the grant is dependent upon the amount of the fixed investment involved. For investments up to 1.5 billion lire (I.L.), a grant of 35% (45% for facilities in certain designated areas) is available for construction, renovation, conversion, transformation, reactivation, and enlargement of industrial facilities. For investments from 1.5 to 5.0 billion lire, available capital grants range from 15% to 20%, and for investments over 5.0 billion lire, they range from 7% to 12%. All three of the above classes can receive additional grants up to 5% of fixed investment for construction of certain infrastructure projects or for training programs, and additional grants up to 10% for purchase of machinery and equipment manufactured in the Mezzogiorno.

Pursuant to this authorization, SIV applied for, and received sometime in mid-1976, a grant from the Cassa for its San Salvo facility.

2. *Preferential financing.* Under Italy's regional development program, reduced rate, medium term loans are available for the creation of new industrial establishments. The maximum amount of any loan is dependent on the size of the investment.

Investments of up to 1.5 billion lire are eligible for loans up to 35% of the cost of fixed equipment and inventories of raw or semi-finished materials. Loans from 35% to 50% are available for investments of more than 5.0 billion lire. Loans for new plants are for 15 years and those for expansion, renewal, transformation, or reactivation of existing plants are for 10 years.

SIV received a 10-year loan at 7.5% interest from IMI (Instituto Mobiliare Italiano) for its San Salvo facility. The commercial rate at that time for comparable loans was 10.5%.

3. *Reduction in the required contribution to the state welfare organization.* Through the end of 1980, industries which establish new facilities in the Mezzogiorno are entitled to a reduced contribution to INPS (the state-run welfare organization). The contribution of qualified enterprises is limited to 30% of salaries paid and 16% to 20% of total labor cost.

The Italian Government indicated that SIV's labor cost savings from this benefit are 11.7%.

The parties agree that the benefits received by SIV, as described above, upon the manufacture or production of float glass were more than *de minimis*.

The record also shows that at the time of the issuance of notice of final rate and modification of the countervailing duty order with respect to float glass from Italy, the Treasury Department had before it information which indicated (1) that the benefits in question had a value of "less than three percent" (i. e., 2.47 percent) of the value of float glass produced by SIV; (2) that in 1975, SIV's exports were 18.6 percent of production; (3) that in 1975, SIV sold more than 97 percent of its production in the European Community; and (4) that in 1975 SIV exported approximately three percent of its production outside of the European Community.

## OPINION

■ Against this background, plaintiffs contend that the foregoing Italian regional development programs clearly result in the payment or bestowal of bounties or grants upon the manufacture or production of float glass in Italy within the meaning of section 303 of the Tariff Act of 1930, as amended. Defendant, on the other hand, argues that section 303 was intended to reach only those programs which distort international trade and that plaintiffs have failed to demonstrate that the alleged bounties or grants possess these requisite effects. For the reasons that follow, it is concluded that these Italian regional development programs result in the payment of bounties or grants upon the manufacture or production of float glass in Italy within the contemplation of section 303 and that defendant's argument is lacking in merit.

■ At the outset, it is to be observed that the language of section 303 is mandatory. Thus, whenever a bounty or grant has been conferred, the Secretary *must* impose countervailing duties. In this connection, the first countervailing duty law of *general* application [1] was enacted as section 5 of the Tariff Act of 1897, 30 Stat. 151, 205, and provided:

> Sec. 5. That *whenever any country, dependency, or colony shall pay or bestow, directly or indirectly, any bounty or grant upon the exportation* of any article or merchandise from such country, dependency, or colony, and such article or merchandise is dutiable under the provisions of this Act, then upon the importation of any such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is

1. More particularly, the Supreme Court pointed out in *Zenith Radio Corp. v. United States,* 437 U.S. 443, 451, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978) that "[t]he language of the 1897 statute evolved out of two earlier countervailing duty provisions that had been applicable only to sugar imports." It is to be added that the first of these two provisions was contained in section 237 of the Tariff Act of 1890, 26 Stat. 584; the second was enacted in 1894. Par. 182½ of the Tariff Act of 1894, 28 Stat. 521.

imported in the same condition as when exported from the country of production or has been changed in condition by re-manufacture or otherwise, *there shall be levied and paid, in all such cases, in addition to the duties otherwise imposed by this Act, an additional duty equal to the net amount of such bounty or grant, however the same be paid or bestowed.* The net amount of all such bounties or grants shall be from time to time ascertained, determined, and declared by the Secretary of the Treasury, who shall make all needful regulations for the identification of such articles and merchandise and for the assessment and collection of such additional duties. [Emphasis added.]

The law was reenacted, virtually without change, in 1909 (section 6 of the Tariff Act of 1909, 36 Stat. 11, 85) and in 1913 (section IV, paragraph E of the Tariff Act of 1913, 38 Stat. 114, 193). In 1922, the statute was expanded to cover bounties or grants upon *manufacture or production,* as well as bounties or grants upon export. Section 303 of the Tariff Act of 1922, 42 Stat. 935. The 1922 version was reenacted in 1930, without changes that are relevant here (section 303 of the Tariff Act of 1930, 46 Stat. 687) and in 1975 (section 331(a) of the Trade Act of 1974, 88 Stat. 2049).

To summarize, the countervailing duty provision in the Tariff Act of 1897, was basically similar to the present section 303 save for one essential feature: The provision in the 1897 act applied only to bounties or grants upon *exportation,* whereas the present statute—stemming from the 1922 amendment—is applicable not only to bounties or grants upon exportation but also to bounties or grants upon *manufacture or production.* See *Zenith, supra,* 437 U.S. at 461, n. 18, 98 S.Ct. 2441.

### The Downs and Nicholas Cases

Prior to the 1922 amendment, two significant cases were decided with respect to the then existing law, namely, *Downs v. United States,* 4 Treas.Dec. 405, T.D. 22984, G.A. 4912 (1901), *aff'd,* 113 F. 114 (4th Cir. 1902), *aff'd,* 187 U.S. 496, 23 S.Ct. 222, 47 L.Ed.

275 (1903) and *Nicholas & Co. v. United States,* 29 Treas.Dec. 59, T.D. 35595 (1915), *aff'd,* 7 Cust.Ct.Appls. 97, T.D. 36426 (1916), *aff'd,* 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461 (1919). *Downs* involved an elaborate scheme of the Russian Government to control the marketing of sugar. Under this scheme, a limited portion of a refiner's production was labelled as "free" sugar and could be sold subject to an excise tax of 1.75 rubles per pood. A greater portion of the refiner's production was labelled as "surplus" sugar and could be sold on the domestic market only upon payment not only of the excise tax of 1.75 rubles per pood, but of an additional tax of 1.75 rubles per pood, or a total of 3.50 rubles per pood. If the refiner exported sugar, he received not only a rebate of the excise tax he would have had to pay if he sold domestically, he also received a certificate allowing him to sell an amount of "surplus" sugar equal to the amount of sugar exported as "free" sugar, thus avoiding payment of the additional excise tax. Alternatively, this certificate could be sold to other domestic sugar refiners.

Based on this factual setting, the courts in *Downs* held that the combination of the exemption with the certificates was an export bounty within the meaning of the 1897 statute. See *Zenith, supra,* 437 U.S. at 459–462, 98 S.Ct. 2441.

With respect to the meaning of the terms "bounty" and "grant," the following statements of the Fourth Circuit in *Downs* —which adopted the decision of the Board of General Appraisers—are pertinent (113 F. at 147):

> The word "bounty," in its ordinary signification, may be defined to be "an additional benefit conferred upon, or a compensation paid to, a class of persons." 1 Bouv. Law Dict. (Ed.1897) p. 260.

\* \* \* \* \* \*

> It is important to observe, in the consideration of this subject, that section 5 of the tariff act of 1897, under which this case arises, does not use the word "bounty" in any narrow or technical meaning. It embraces "any bounty or grant" be-

stowed or conferred by the government, whether directly or indirectly. The word "grant" is more comprehensive in meaning than the term "bounty". It implies the conferring by the sovereign power of some valuable privilege, franchise, or other right of like character, upon a corporation, person, or class of persons. * * *

It is to be noted that in *Downs,* as the Supreme Court stated, "the main argument of the * * * [importer] * * * [was] addressed to the proposition that this bounty is paid, not upon exportation, but upon production." 187 U.S. at 512, 23 S.Ct. at 227.[2] Addressing itself to this contention, the Court declared (187 U.S. at 512–3, 23 S.Ct. at 227–228):

The answer to this is that every bounty upon exportation must, to a certain extent, operate as a bounty upon production, since nothing can be exported which is not produced, and hence a bounty upon exportation, by creating a foreign demand, stimulates an increased production to the extent of such demand. Conversely, a bounty upon production operates to a certain extent as a bounty upon exportation, since it opens to the manufacturer a foreign market for his merchandise produced in excess of the demand at home. A protective tariff is the most familiar instance of this, since it enables the manufacturer to export the surplus for which there is no demand at home. If there were no tariff at all, and the expense of producing a certain article at home were materially greater than the expense of producing the same article abroad, there would be none produced, and, of course, none to export. But with the aid of such tariff production would be stimulated, and might become so much greater than the home demand, that a manufacturer would look to foreign markets for his surplus. In the case of Russian sugar the effect of the import duties is much enhanced by the fact that, the supply of free sugar from the home market being limited, the selling price is very remunerative, and each producer has therefore an interest in placing as much sugar as he can on the home market; and as the total amount of free sugar is distributed among all the manufactories in proportion to their entire production, it may become to their interest to export their surplus even at a loss, if such loss can be compensated by the profits on sugar sold in the home market. This would not make the tariff a bounty upon exportation, but a mere incident to its operation upon production. But, if a preference be given to merchandise exported over that sold in the home market, by the remission of an excise tax, the effect would be the same as if all such merchandise were taxed, and a drawback repaid to the manufacturer upon so much as he exported. If the additional bounty paid by Russia upon exported sugar were the result of a high protective tariff upon foreign sugar, and a further enhancement of prices by a limitation of the amount of free sugar, put upon the market, we should regard the effect of such regulations as being simply a bounty upon production, although it might incidentally and remotely foster an increased exportation of sugar; but where in addition to that these regulations exempt sugar exported from excise taxation altogether, we think it clearly falls within the definition of an indirect bounty upon exportation.

In the *Nicholas* case the British Government exempted exporters of spirits from paying certain domestic excise taxes and also made an allowance to such exporters of 3d. or 5d. per gallon, depending on the spirits exported. The Board of General Appraisers, the Court of Customs Appeals and the Supreme Court all agreed that this program constituted a bounty or grant within the meaning of the countervailing duty statute. In this connection, the Board em-

---

**2.** As the Supreme Court noted in *Zenith, supra,* 437 U.S. at 461, n. 18, 98 S.Ct. at 2451 n. 18:

* * * This latter argument [in *Downs*] was based on the fact that the 1897 statute covered only bounties on exportation and not those on production. In 1922, Congress amended the statute to cover bounties on production and manufacture as well as exportation. Tariff Act of 1922, *supra,* n. 8.

phasized that it is only the *effect* and not the *purpose* of a foreign statute that may be inquired into by the courts. Thus, as the Board made clear, if the effect of any such law is to bestow a bounty or grant upon the exporter of merchandise to the United States, then a countervailing duty must be assessed. Specifically, the Board observed (29 Treas.Dec. at 61–62):

The policy or purpose of the British law is not a subject with which we can deal. In the wisdom of the British lawmakers the complicated provisions of this statute were doubtless deemed necessary and advisable to safeguard their revenues, and whether the *purpose* of these provisions was to create a bounty or grant upon the export of spirits like those in question is not a matter into which we may inquire. *Our inquiry is: Is such the effect of this statute and its administration?* [Emphasis added.]

\* \* \* \* \* \*

\* \* \* In the act of 1897, where the provision here under consideration first appears, this policy of protection was affirmatively stated in the title. While we may not inquire into the purposes but only the *effect* of a foreign law, in determining the meaning of a statute of the United States which it is our function to construe, we may with perfect propriety look to its purpose. Section 5 of the act of 1897 is undoubtedly a part of the national policy as declared in the title of the law "to encourage the industries of the United States." Its purpose was to prevent an unequal competition in our domestic market with the products of other countries, and in determining its application to any state of facts this policy should be kept in mind, for its reenactment by Congress without any change of verbiage indicates the adoption of the same general policy to this extent at least. [Emphasis added.]

■ The Court of Customs Appeals also made it clear that the countervailing duty statute was concerned with *results* or *effects* and not purposes or intentions. *Nicholas & Co. v. United States,* 7 Ct.Cust.Appls.

97, 106, 107, 108, 109, 113, *aff'd,* 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461 (1919). Of particular interest are the following remarks of the court (7 Ct.Cust.Appls. at 106–107):

There is nothing obscure, abstruse, mystic, or even ambiguous about this language, which has been, as to the particular words, a part of all our tariff acts from 1897 to and including the present act. Section 5, tariff act of 1897 (30 Stat.L., 151), section 6, tariff act of 1909 (36 Stat.L., 11), paragraph E of section 4, tariff act of 1913 (38 Stat.L., 114). Its plain, explicit, and unequivocal purpose is: Whenever a foreign power or dependency or any political subdivision of a government shall give any aid or advantage to exporters of goods imported into this country therefrom whereby they may be sold for less in competition with our domestic goods, to that extent by this paragraph the duties fixed in the schedule of the act are increased. It was a *result* Congress was seeking to equalize regardless of whatever name or in whatever manner or form or for whatever purpose it was done. The statute interprets itself as a member of an act calculated to maintain an accorded protection, incidental or otherwise, as against payments or grants of any kind by foreign powers, *resulting* in an equalization thereof to any extent directly or indirectly. Wherefore, in obedience to that obvious purpose, the court does not feel at liberty to adopt any constrained or technical definitions of the words "bounty" or "grant" suggested but to vouchsafe the paragraph a meaning, well within its language, that will best effectuate the unquestioned congressional purpose. [Emphasis in original.]

A great portion of the briefs and record is devoted to an effort to show these payments to exporters of spirits by the United Kingdom to be an equivalent of certain extra costs attending the excise collections. "In consideration of the loss and hindrance caused by excise regulations."

\* \* \* \* \* \*

The fact that the payment made by the foreign government was estimated or calculated upon a certain basis or in consideration of extra burdens imposed by domestic excise laws, or *for any other reason of domestic government or policy commending itself to the wisdom of Parliament,* is not controlling in our courts. The sole inquiry is, do the results of such acts stimulate exportation or give a special advantage by affording aid from the public treasury whereby such goods may when exported be sold in competition with ours for less. * * * [Emphasis added.]

* * * If it be true that the excise system delineated intentionally or accidentally results in "an advantage to exporters of spirits to this country from the United Kingdom of Great Britain, which directly or indirectly is borne by the public treasury," or affords "a premium in like manner given or paid to encourage any branch of industry or manufactures," likewise exporting, such falls within this paragraph. *Downs v. United States* (187 U.S. 496, 502 [23 S.Ct. 222, 47 L.Ed. 275]). And, it matters not, nor is it made by Congress an exception thereto, that it is an incidental, indirect, or *unintended* result of the British Government's endeavoring to in part repay or compensate its manufacturers and distillers for a burdensome excise system. The courts are concerned with results and not intentions. [Emphasis in original.]

The following additional comments by the court in *Nicholas* are also pertinent (7 Ct.Cust.Appls. at 113–114):

Whatever may have been the purpose or consideration of the payment made upon exportation of these spirits, the incontrovertible fact is present that it necessarily encouraged their exportation and enabled the exporter to sell them at a proportionately less price in competition with the goods of this country. It is a payment directly to the exporter for and upon exportation and the entry of said goods in our body commerce. The doctrine of the case, therefore, may be paraphrased from the language of the Supreme Court in *Allen v. Smith* [173 U.S. 389, 402, 19 S.Ct. 446, 43 L.Ed. 741 (1899)], * * *:

Whether allowed in consideration of services rendered or to be rendered, or with the object of a public interest to be obtained, production or manufacture to be stimulated, or a moral obligation to be recognized, it is a bounty.

The Supreme Court in *Nicholas* similarly concluded that notwithstanding that such allowances may be intended merely as compensation for distillers for costs due to British excise regulations and are not confined to cases of exportation, they are, as applied to exports, governmental payments—namely "grants"—made only upon exportation, which, by lessening the burden of British taxation, enable the spirits to be sold more cheaply here than at home—the situation against which the countervailing duty statute was intended to provide. *Nicholas & Co. v. United States,* 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461 (1919). The Court stated (*id.* at 39, 39 S.Ct. at 220):

* * * The statute was addressed to a condition and its words must be considered as intending to define it, and all of them—"grant" as well as "bounty"—must be given effect. If the word "bounty" has a limited sense the word "grant" has not. A word of broader significance than "grant" could not have been used. Like its synonyms "give" and "bestow," it expresses a concession, the conferring of something by one person upon another. And if the "something" be conferred by a country "upon the exportation of any article or merchandise" a countervailing duty is required by Paragraph E.

There can be, therefore, but one inquiry: Was something—bounty or grant—paid or bestowed upon the exportation of spirits? * * *

Following the extremely broad reading given to the countervailing duty law by the Supreme Court in *Nicholas* and *Downs,* Congress undertook, in 1922, to broaden the statute even further by providing for the imposition of countervailing duties against imported merchandise upon which there

had been conferred bounties or grants upon *manufacture* or *production.* The line drawn between bounties or grants upon export and bounties or grants upon production, described by the Supreme Court in *Downs,* was removed, and all such bounties or grants were covered by the Act. As noted previously, the text of the 1922 statute was reenacted without substantial change in 1930[3] (section 303 of the Tariff Act of 1930, 46 Stat. 687), and in 1975 (section 331(a) of the Trade Act of 1974, 88 Stat. 2049).[4]

■ Against the plain language of the statute and the comprehensive judicial discussions of the predecessor provisions involving export bounties, we turn to the Italian programs in question. Unquestionably, the *effect* of these programs has been to reduce SIV's cost of producing float glass. And whether the reduction in cost is occasioned by direct cash payments, or by an act of government reducing labor cost, capital cost, or the cost of any other factor of production is of no consequence. For if a benefit or advantage is received in connection with the production of merchandise, that benefit or advantage is a bounty or grant on production. And to the extent that such bountied merchandise is exported to the United States, it comes squarely within our countervailing duty law—section 303.

### The Secretary of the Treasury's Reasons for Issuing a Negative Countervailing Duty Determination

As set forth above, the Secretary of the Treasury refused to issue a countervailing

3. The principal change in the 1930 Act was the conferral on the Secretary of the Treasury of the power to *estimate* the net bounty or grant found to have been paid or bestowed.

4. While the Trade Act made numerous changes in the countervailing duty law—e. g., extending its coverage to duty-free merchandise, imposing time limits on the Secretary of the Treasury by which to take action, providing for judicial review by American manufacturers—the portion of section 303 of the Tariff Act relevant here was left virtually intact.

5. Interrogatory no. 23 asked:

duty determination for the following stated reasons (42 Fed.Reg. 13016–17, March 8, 1977, T.D. 77–77):

Information has now been received with respect to SIV which permits a more complete analysis of the alleged bounties and grants. Under various regional development programs administered by the Government of Italy, it now appears that an investment grant, preferential financing and a reduction in the required contribution to the state welfare organization have been given to SIV. No special tax reductions have been utilized by SIV. *The Italian Government has advised the Treasury Department that the benefits received by SIV have the effect of offsetting disadvantages which would discourage SIV from moving to and expanding in less prosperous regions. Inasmuch as SIV sells a preponderance of its production in the European community—more than 97 percent in 1975—the level of its exports outside the European Community is a small percentage of its production, and the amount of assistance provided by the government programs to SIV totaled less than three percent of the value of float glass it produced, those benefits are not regarded as bounties or grants within the meaning of section 303 of the Tariff Act of 1930, as amended (19 U.S.C. § 1303).* [Emphasis added.]

The foregoing explanation was enlarged by defendant in response to plaintiffs' interrogatory no. 23.[5] In its response, defendant stated:

Explain, in detail, why the Secretary of the Treasury or his delegate determined "that no bounty or grant is being, or has been, paid or bestowed directly or indirectly, upon the manufacture, production, or exportation of float glass from Italy produced by Societa Italiana Vetro, S.p.A. within the meaning of section 303, Tariff Act of 1930, as amended (19 U.S.C. § 1303) . . . ." In your response to this interrogatory, please explain the significance, if any, of the following: (a) the Treasury Department's finding that S.I.V. sells the preponderance of its production in the European Community; (b) the Treasury Department's finding that the amount of as-

On May 31, 1974, in accordance with 19 C.F.R. § 16.24(b) (1974), a petition was submitted to the Treasury Department alleging that bounties or grants had been paid or bestowed, within the contemplation of 19 U.S.C. § 1303, on float glass manufactured or produced in Italy. See 40 Fed.Reg. 2718 (1975). Accordingly, it became necessary for the Secretary of the Treasury to conduct an administrative investigation into the allegations, and such an investigation was conducted in accordance with 19 C.F.R. § 159.47(c) (1975).

It was ascertained that, in fact, benefits had been given to two producers of float glass in Italy (one being SIV). It was further ascertained that those benefits were afforded pursuant to regional development programs administered by the Government of Italy. The Italian Government advised Treasury that the various regional development programs in question were designed to accomplish certain domestic economic and social goals by offsetting disadvantages which would otherwise discourage industry from moving into and expanding in less prosperous regions. Further, the Italian Government advised that the programs were not designed to favor exports.

It was necessary for Treasury to analyze various relevant factors to determine whether the benefits in question were bounties or grants within the contemplation of 19 U.S.C. 1303. This analysis was designed to ascertain the nature and extent of the consequences of the benefit programs involved, i. e., the economic affects [sic].

In this case, the factors considered by Treasury were:

1) the ad valorem size of the benefits afforded; and

2) the extent to which the product receiving the benefits entered international commerce.

In applying these factors, Treasury considered and ascertained the following (42 Fed.Reg. 13016 (1977)):

> The Italian Government has advised the Treasury Department that the benefits received by SIV have the effect of offsetting disadvantages which would discourage SIV from moving to and expanding in less prosperous regions. Inasmuch as SIV sells a preponderance of its production in the European Community—more than 97 percent in 1975—the level of its exports outside the European Community is a small percentage of its production, and the amount of assistance provided by the government programs to SIV totaled less than three percent of the value of float glass it produced * * *

The determination made in T.D. 77–77 (42 F.R. 13016) that the benefits described in response to interrogatory 18 did not constitute a bounty or grant within the meaning of section 303 of the Tariff Act of 1930, as amended (19 U.S.C. 1303) was made in view of the above considerations and factual findings.

As explained above, Treasury's findings that (a) SIV sells a preponderance of its production in the European Community, (b) the amount of the assist provided by the Italian Government to SIV produced, [sic] and (c) the subject benefits have the effect of offsetting disadvantages which would discourage SIV from moving to and expanding in less prosperous regions, were all considered in making the determination set forth in T.D. 77–77.[6]

In the absence of a finding that the benefits distorted international trade, it was determined that no bounties or grants had in fact been paid within the scope of 19 U.S.C. 1303, accordingly, in

---

sistance provided by the government programs to S.I.V. totaled less than 3% of the value of float glass it produced; and (c) the Italian Government's advising the Treasury Department that the subject benefits have the effect of offsetting disadvantages which would discourage S.I.V. from moving to and expanding in less prosperous regions.

**6.** Actually Treasury made no *finding* in T.D. 77–77—or anywhere else—that "the subject benefits have the effect of offsetting disadvantages which would discourage SIV from moving to and expanding in less prosperous regions."

the absence of a bounty or grant, a zero rate was declared.

### The Secretary of the Treasury's Reasons for not Countervailing Lack Validity

■ For the reasons set out below, none of the reasons set forth by the Secretary as reasons for refusing to issue a countervailing duty determination has legal validity. In the first place, as is made clear in the *Nicholas* case, the alleged purpose of the Italian Government in conferring grants upon manufacture or production is entirely irrelevant. The question rather is what is the *effect* or *result* of a particular program. In that circumstance, in treating the grants in question as not being grants upon manufacture or production because of certain alleged purposes of the Italian Government for the grants, the Treasury Department acted contrary to the statutory mandate both as written and construed by the courts.

■ A second factor considered by the Treasury Department—the ad valorem size of the benefits afforded—likewise cannot justify the failure to issue a countervailing determination. On this aspect, it is noted that the Treasury Department determined that the subject benefits had a value of 2.47 percent of the value of float glass produced by SIV which is concededly more than *de minimis*. Yet in the countervailing duty case of *Certain Handbags from the Republic of China*, Treasury acknowledged that a benefit equalling 0.8 percent ad valorem was greater than *de minimis* and therefore countervailable. 42 Fed.Reg. 28531 (1977). Further, in the countervailing duty case of *Certain Fasteners from Japan*, Treasury considered benefits of 0.20 percent ad valorem to be "more than *de minimis* and therefore constituting bounties or grants," because that amount was significant when compared to the relevant ad valorem rate of duty equivalents—i. e., 0.75 percent ad valorem and 0.25 percent ad valorem. 42 Fed.Reg. 23146–47 (1977). When the ad valorem size of the benefit in the present case as determined by the Treasury Depart-

ment (2.47 percent) is compared to the average ad valorem rate of duty equivalent for the principal TSUSA category (item 543.-2770) of float glass imported from Italy in 1975 (6.9 percent),[7] the benefit is even more significant, having a ratio to the duty rate of 35.8 percent (2.47:6.9). It is thus clear that the grants here involved were of such sufficient magnitude that they should have been countervailed.

■ The third factor stated to have been considered by the Treasury Department is the extent to which the products receiving the benefits entered international commerce. However, the level of exports is not determinative of whether there is a bounty or grant. There is no question but that the ad valorem size of the subject benefits conferred, as determined by the Treasury Department, was the same for every unit of float glass sold by SIV, whether one percent or 100 percent of saleable production was exported from Italy. Furthermore, it is clear that had the subject benefits been determined by the Treasury Department to have been countervailable bounties or grants, countervailing duties in an amount equal to the benefits as determined by Treasury would have been assessed on every unit of float glass, produced by SIV, imported from Italy into the United States, regardless of the percentage of that company's production that was exported to the United States, or to anywhere else. Viewed thusly, the level of exports cannot be determinative of whether there is a bounty or grant. The fact is that every unit of Italian float glass, produced by SIV, imported into the United States has been benefited by an equal amount, as a result of grants (which are more than *de minimis*). And in that situation, the countervailing duty law requires that such benefits on each unit of float glass imported from Italy and produced by SIV be offset.

It is also to be noted that according to the Treasury Department's determination, the level of SIV's "exports *outside* the Europe-

---

7. See Bureau of the Census, *U. S. Imports of Nonmetallic Minerals and Products (TSUSA* *Nos. 511.1100—548.0500) for Consumption— IM 146 Schedule 5* (December 1975).

an Community is a small percentage of its production." 42 Fed.Reg. 13016–17 (1977). [Emphasis added.] Similarly in the case of *Float Glass from Belgium* (41 Fed.Reg. 1299 (1976)) Treasury used as a criterion the level of exports to countries *outside* the European Community. By contrast, in the cases of *Float Glass from the United Kingdom* (40 Fed.Reg. 27499 and 40 Fed.Reg. 59227 (1975)) and *Float Glass from West Germany* (41 Fed.Reg. 1300 (1976)) the Treasury Department used a different criterion, i. e., the level of *total* exports. Thus, notwithstanding that defendant asserted that one of the factors considered by Treasury in reaching its negative determination was "the extent to which the product receiving the benefits entered international commerce," Treasury disregarded Italian float glass produced by SIV which was exported in international commerce to other members of the European Community.

The short of the matter is that neither criterion—level of total exports or level of exports outside the European Community—is any criterion at all—i. e., not one of the factors which Congress deemed relevant in administering the countervailing duty law. However, should that factor which Treasury considered in other cases, and which defendant stated was considered here, be applied, there can be no doubt that as a factual matter the level of exports here—which is admittedly 18.6 percent of production in 1975—is certainly greater than *de minimis.*

In summary, the Treasury Department has failed to justify its refusal to countervail the subject grants bestowed on the manufacture of Italian float glass produced by SIV. Its entire analysis has been vitiated by its consideration of an irrelevancy—*viz.,* the alleged purpose of the Italian regional development programs.

Moreover, the special "factors" which Treasury proceeded to consider, in view of the alleged domestic purpose of the Italian programs are not only irrelevant, they fail to support Treasury's analysis. For the "ad valorem size of the benefits" is admittedly greater than *de minimis* and the "extent to which the product receiving the benefits entered international commerce" (which is also greater than *de minimis*) in no way affects the value of the benefit conferred on every unit sold. Thus, no valid reason has been given for not countervailing the substantial grants involved herein.

■ What is more, assuming *arguendo* that these special factors are relevant, the record establishes without contradiction that the Treasury Department has no standards whatever as to the size of the benefits necessary for issuance of a countervailing duty determination or as to what extent the product receiving the benefits must enter international commerce before a countervailing duty determination is made. Instead, as was made clear in oral argument, the Treasury Department implements these factors on a case-by-case basis without benefit of standards, guidelines or yardsticks (tr. 86–89). Were the court to place its stamp of approval on the exercise of such virtually unfettered discretion by the Secretary in derogation of the Congressional mandate, there would be a complete abdication of judicial responsibility. The countervailing duty statute does not fluctuate from case to case, encompassing grants upon production in some instances, while for ineffable reasons, excluding such grants in others. On the contrary, the Secretary of the Treasury has been directed to offset the effect of bounties or grants bestowed upon the production of goods which are exported to our shores. Once he determines that such bounties or grants have been bestowed, his inquiry must cease and he has an absolute duty to countervail (or invoke the temporary waiver authority under 19 U.S.C. § 1303(d) if such authority is in effect).

*The Legislative History and the Contemporaneous and Consistent Interpretation of the Countervailing Duty Statute by the Treasury Department Show that Congress Did Not Intend to Limit Countervailable Bounties or Grants to Benefits which Promote Exports*

■ Defendant contends that the countervailing duty law was intended to reach

only those bounties or grants which distort trade, i. e., promote exports. Its argument is based on its perception of the legislative history, case law, and the Secretary's *present* interpretation which, it says, is entitled to great weight. However, for the reasons set out below, the argument is without merit.

As previously discussed, it was not until 1922 that the countervailing duty law provided for bounties or grants bestowed upon manufacture or production. Thus defendant's excessive comments on the history of the Tariff Acts of 1890, 1894 and 1897—all of which were restricted to bounties or grants on exportation—are irrelevant.

On the other hand, the Tariff Act of 1922 was not restricted to export bounties. This is evident from the statutory language: "That whenever any country, dependency, colony, province, or other political subdivision of government, person, partnership, association, cartel, or corporation shall pay or bestow, directly or indirectly, any bounty or grant *upon the manufacture or production or export* \* \* \*." 42 Stat. 935 [emphasis added]. In introducing the amendatory language on the House floor, Congressman Hawley, floor manager of the bill, stated (61 Cong.Rec. 4132 (1921)):

> Mr. Chairman, this amendment simply affects the export from foreign countries of commodities made under a bounty, so that whether they are made for use in that country nominally and then exported, or made for purposes of export, the conditions will apply to them the same in both cases.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> This provision printed in the act, I think, is practically the current law. But there have been, for instance, jams and jellies manufactured in Australia and other parts of the Southern Hemisphere, where a bounty has been given on the manufacture, as if for consumption in that country, and then afterwards the products were exported. Now, if there is a bounty given for goods manufactured for export, then the terms of this paragraph apply. *These amendments were drafted by the*

*Customs Division of the Treasury Department, so that when the goods are manufactured for export or manufactured for home consumption and then exported, the regulations in this paragraph shall apply.* [Emphasis added.]

Congressman Hawley's remark thus made clear that the 1922 amendment providing for bounties or grants upon manufacture or production was intended to reach goods whether manufactured for export or manufactured for home consumption and then exported. In other words, it is apparent that Congress wished to countervail products imported into the United States which received bounties or grants upon their manufacture or production, regardless of the intended destination of the products at the time of their manufacture or production. Indeed, the Secretary of the Treasury so interpreted the statute. See T.D. 39722 (1923) and T.D. 40001 (1924), involving "Australian bounty on manufacture of fencing wire, galvanized sheets, traction engines, and wire netting." It should be noted that on several occasions while T.D. 40001 was in force, Treasury became aware of the *absence of imports* of products embraced by T.D. 40001, and further was informed by letter dated December 4, 1937 from the Assistant Secretary of State to the Secretary of the Treasury of the following:

> *These bounties* on wire netting and tractors *are for the object of encouraging production in Australia for the domestic market* without recourse to the imposition of protective tariff duties against competitive imported articles and a consequential raising of prices to agriculturalists. *There is no question of encouraging production for export* and at the present time tractors to the value of $750,000 are being imported from the United States. [Emphasis added.]

Notwithstanding these considerations, Treasury issued a further amendatory countervailing duty order in 1932 to take into account the increased Australian bounty (T.D. 45384 (1932)), and did not revoke the countervailing duty order until 1949 (T.D. 52350 (1949)), at which time it determined,

based on information from the Department of State, that no bounties or grants were being paid or bestowed.[8]

Relevant also are two countervailing duty orders covering Canadian cheese, T.D. 50093 (1940) and T.D. 53182 (1953). With respect to these orders, in a memorandum to the files, dated May 28, 1964, former Deputy Assistant Secretary of the Treasury Hendrick reported about a meeting he attended at the Department of Agriculture at which he stated, among other things:

> * * * [O]ur General Counsel's office was working on a theory that a payment in respect of a particular product made by a government for a purpose other than stimulating exports to the United States could be considered outside the scope of the countervailing duty law provided that there was no substantial increase in exports to the United States attributable to the payment. I noted that this theory appeared inconsistent with the 1940 order relating to Canadian cheddar cheese and the similar 1953 order relating to Canadian blue vein cheese. * * *

It is important to add that these two countervailing duty orders—T.D. 50093 and T.D. 53182—were issued without regard to any "trade effects" and notwithstanding that the production bounties involved therein were not export-inducing. Indeed, in response to a letter dated August 16, 1939 from an importer—the National Biscuit Company—stating that the purpose of the Canadian payments countervailed in T.D. 50093 was not for the purpose of subsidizing exports but to encourage the *production* of a better grade of cheese, Assistant Deputy

Commissioner of Customs Griffith replied by letter dated August 26, 1939 in which, among other things, he emphasized that the countervailing duty statute reached bounties or grants upon *production*—not just exports. Thus in his letter Mr. Griffith stated in part:

> * * * Enclosed for your information is a reprint of section 303 of the Tariff Act of 1930 from which it will be observed that whenever a bounty or grant is paid or bestowed, directly or indirectly, upon the manufacture or *production* or export of any article or merchandise which is dutiable under the provisions of the tariff act, there shall be levied and paid upon such article or merchandise, when imported into the United States, an additional duty equal to the net amount of such bounty or grant. [Emphasis in original.]
> * * *

Further with respect to T.D. 53182, the American Embassy in Canada advised the Department of State in 1952 that the cheese in question was produced solely by Benedict Fathers in a monastery and that total production was consumed in Canada. But notwithstanding the fact that the government recognized in 1952 and again in 1964 (at the time of Deputy Assistant Secretary Hendrick's memorandum) that imports of cheese subject to the two countervailing duty orders (T.D. 50093 and T.D. 53182) were minimal, it was not until after Treasury had been informed in 1968 of the termination of the Canadian payments to cheese producers that Treasury discontinued the countervailing duty orders in question. T.D. 68–147 (1968).[9]

---

**8.** Defendant argues that T.D. 39722 and T.D. 40001 do not support the view that the countervailing duty statute was intended to reach goods manufactured for home consumption and then exported on the basis that the Australian statute in question provided in part that:

> The Governor-General may, subject to this Act, authorize the *payment* out of the Consolidated Revenue Fund, *which is hereby appropriated for the purpose of bounty,* * *. [Emphasis added.]

The short answer to this argument is that the Australian statute is no different in substance from the Italian programs which permit the conferral of grants. For whether the benefit is

termed a bounty or a grant, it is covered by the countervailing duty law.

**9.** While conceding that the benefits under the Italian regional development programs here involved are "grants" within the dictionary definition, defendant seemingly argues that grants under regional development programs occupy a special status under the countervailing duty statute. But this is not apparent from the *affirmative* countervailing duty order that was issued in the case of *Countervailing Duties— X—Radial Steel Belted Tires from Canada,* T.D. 73–10 (1973) which involved grants to the Michelin Tire Corporation under a Canadian

*The Waiver Authority Provided by the Trade Act of 1974*

██  Additionally, defendant argues that the waiver authority (19 U.S.C. § 1303(d)(2)) added by the Trade Act of 1974, 88 Stat. 1978 (1975), demonstrates that Congress intended the countervailing duty statute to reach only those bounties or grants that have an adverse effect on international trade. The argument is completely untenable.

19 U.S.C. § 1303(d) reads as follows:

*Temporary provision while negotiations are in progress*

(d)(1) It is the sense of the Congress that the President, to the extent practicable and consistent with United States interests, seek through negotiations the establishment of intentionally agreed rules and procedures governing the use of subsidies (and other export incentives) and the application of countervailing duties.

(2) If, after seeking information and advice from such agencies as he may deem appropriate, the Secretary of the Treasury determines, at any time during the four-year period beginning on January 3, 1975, that—

(A) adequate steps have been taken to reduce substantially or eliminate during such period the adverse effect of a bounty or grant which he has determined is being paid or bestowed with respect to any article or merchandise;

(B) there is a reasonable prospect that, under section 2112 of this title, successful trade agreements will be entered into with foreign countries or instrumentalities providing for the reduction or elimination of barriers to or other distortions of international trade; and

(C) the imposition of the additional duty under this section with respect to such article or merchandise would be likely to seriously jeopardize the satisfactory completion of such negotiations;

the imposition of the additional duty under this section with respect to such article or merchandise shall not be required during the remainder of such four-year period. This paragraph shall not apply with respect to any case involving non-rubber footwear pending on January 3, 1975, until and unless agreements which temporize imports of non-rubber footwear become effective.

(3) The determination of the Secretary under paragraph (2) may be revoked by him, in his discretion, at any time, and any determination made under such paragraph shall be revoked whenever the basis supporting such determination no longer exists. The additional duty provided under this section shall apply with respect to any affected articles or merchandise entered, or withdrawn from warehouse, for consumption on or after the date of publication of any revocation under this subsection in the Federal Register.[10]

___

regional development program. The benefits extended to Michelin under the regional development program consisted of (1) public assistance grants to offset capital expenditure costs for constructing industrial facilities in Nova Scotia, which grants were not conditioned upon the exportation of products; (2) a six percent loan which was below the interest rate prevailing at the time; and (3) lower property taxes than other property owners. See *Michelin Tire Corporation v. United States*, Customs Court No. 75–9–02467. See also, e. g., *Certain Fish From Canada*, 43 Fed.Reg. 25996 (June 16, 1978).

**10.** 19 U.S.C. § 1303(e) authorizes either House of the Congress to veto a determination of the

Secretary under § 1303(d)(2). Specifically, 19 U.S.C. § 1303(e) provides:

*Reports to Congress*

(e)(1) Whenever the Secretary makes a determination under subsection (d)(2) of this section with respect to any article or merchandise, he shall promptly transmit to the House of Representatives and the Senate a document setting forth the determination, together with his reasons therefor.

(2) If, at any time after the document referred to in paragraph (1) is delivered to the House of Representatives and the Senate, either the House or the Senate adopts, by an affirmative vote of a majority of those present and voting in that House, a resolution of disapproval under the procedures set

Examination of these statutory provisions makes it crystal clear that § 1303(d)(2) does not specify what is or what is not a bounty or grant. On the contrary, it identifies the conditions under which the Secretary of the Treasury may postpone the assessment of countervailing duties (until January 3, 1979) in order to facilitate the negotiation of an international agreement. See H.R.Rep.No. 93–571, 93d Cong., 1st Sess. 75–76 (1973); Staff of Senate Comm. on Finance, *Summary and Analysis of H.R. 10710—the Trade Reform Act of 1973,* 93d Cong., 2d Sess. 50–51 (1974); S.Rep.No.93–1298, 93d Cong., 2d Sess. 183–188 (1974); U.S.Code Cong. & Admin.News 1974, p. 7186. In short, Congress recognized that countervailable bounties or grants may *not* have an "adverse effect", and Congress authorized the Secretary of the Treasury to postpone the assessment of duties to offset such bounties or grants—provided that the conditions specified in § 1303(d)(2)(B) and (C) were also met. Thus, Senator Long, Chairman of the Finance Committee, explained the purpose of the suspension or waiver authority as follows (124 Cong.Rec. S 18551 (daily ed. Oct. 12, 1978)).

In the Trade Act of 1974, Congress directed the President to seek new international rules on subsidy and countervailing duty practices in the multilateral trade negotiations. Our law does not require any finding that subsidized imports are injuring a domestic industry before a countervailing duty is imposed. The general agreement on tariffs and trade requires such an injury finding. Although we are exempt from that GATT requirement under a grandfather clause, our trading partners consider our law to be a violation of the "Spirit" of the GATT. To permit the President to avoid confrontations over the U.S. countervailing duty law while a subsidy code was being negotiated, Congress permitted countervailing

duties to be waived; that is, not collected even though a subsidy exists, until January 3, 1979, under certain conditions.

Actually, pursuant to the authority provided by § 1303(d)(2) examinations into trade effects of bounties or grants have been made frequently by the Secretary of the Treasury for the purpose of determining whether to *waive* or *suspend* the imposition of countervailing duties on products upon which countervailable bounties or grants were found to have been bestowed. Thus, in numerous cases, the Secretary of the Treasury waived the imposition of countervailing duties upon receiving assurances from exporters that a bounty-fed product would not be marketed aggressively in the United States so as to cause sales quantities to exceed historic marketing levels. *Butter Cookies From Denmark,* 43 Fed.Reg. 955 (January 5, 1978); *Cheese From Sweden,* 41 Fed.Reg. 27032 (July 1, 1976); *Cheese From Finland,* 41 Fed.Reg. 24703 (June 18, 1976); *Cheese, Other Than Jarlsberg, From Norway,* 41 Fed.Reg. 21767 (May 28, 1976); *Cheese From Switzerland,* 41 Fed.Reg. 1468 (January 8, 1976); *Cheese From Austria,* 41 Fed.Reg. 1275 (January 7, 1976); *Canned Hams and Shoulders From France, The United Kingdom, West Germany, Luxembourg, Ireland, The Netherlands, Denmark, Italy, and Belgium,* 41 Fed.Reg. 55639 (December 1, 1975). Further, in the *Canned Hams* case, the Treasury Department conditioned the waiver on "the general economic situation of the swine industry in the U.S. which will be appraised from time to time in order to determine whether remaining restitution payments on EC canned hams and shoulders are having an adverse effect on the industry." With respect to assessing the state of the industry, the Treasury stated that the factors to be taken into account would be "(a) import penetration by the EC product, including share of U. S. Market;

forth in section 2192 of this title, then such determination under subsection (d)(2) of this section with respect to such article or merchandise shall have no force or effect beginning with the day after the date of the adoption of such resolution of disapproval,

and the additional duty provided under this section with respect to such article or merchandise shall apply with respect to articles or merchandise entered, or withdrawn from warehouse, for consumption on or after such day.

(b) trends in U. S. consumption; (c) changes in profitability of the U. S. hog industry; (d) the relationship of the price of hogs to the price of corn in the United States commodity markets."

In brief, the authority to waive based on consideration of the impact on trade of a bounty or grant was not intended to be authority to deem a bounty or grant non-countervailable. Indeed, the Senate-House conferees on the 1974 Trade Act stated expressly that the waiver provision should not be construed as the intent of Congress that an injury concept be injected into countervailing duty cases. H.R.Rep. No.93–1644, 93d Cong., 2d Sess. 45 (1974).

As previously noted, the four-year temporary waiver authority expired on January 3, 1979. Therefore, since retroactive legislation has not as yet been enacted, numerous products entered after January 3, 1979 are subject to countervailing duty assessment, notwithstanding that the Secretary of the Treasury has determined that "adequate steps have been taken to reduce substantially or eliminate  *   *   *   the adverse effect of a bounty or grant which he has determined is being paid or bestowed  *   *   *." 19 U.S.C. § 1303(d)(2)(A). Thus, on the eve of the expiration of the waiver authority, the Treasury Department published in the Federal Register an order that all dutiable merchandise which had previously been the subject of a countervailing duty waiver (including the aforementioned butter cookies, cheeses, and canned hams and shoulders), and which was entered or withdrawn from warehouse for consumption on or after January 3, 1979 was to be subject to the payment of countervailing duties. 44 Fed.Reg. 141–142 (January 2, 1979). More particularly, this order stated (id. at 142):

*   *   * [E]ffective on January 3, 1979, and until further notice,  *   *   * dutiable merchandise [which was subject to a countervailing duty waiver], imported directly or indirectly from the country where manufactured or produced, which benefits from bounties or grants and which is entered, or withdrawn from warehouse, for consumption on or after January 3, 1979, shall be subject, in addition to any other duties determined or estimated to be due, to payment of countervailing duties. Any merchandise subject to the terms of this order shall be deemed to have benefitted from a bounty or grant if such bounty or grant has been or will be credited or bestowed, directly or indirectly, upon the manufacture, production or exportation of such merchandise. [Emphasis added.]

In summary, it is a patent misreading of the law to argue that the criteria for waiver or postponement are also the criteria for determining whether a bounty or grant has been conferred.

### The Congressional Intent in the Trade Act of 1974 to Seek International Agreements

Defendant insists that its argument with respect to the waiver authority in the Trade Act of 1974 is buttressed by yet another clause, i. e., 19 U.S.C. § 1303(d)(1) which, as previously quoted, states that "[i]t is the sense of Congress that the President  *   * seek through negotiations the establishment of internationally agreed rules and procedures governing the use of subsidies (and other *export incentives* ) and the application of countervailing duties." [Emphasis added.] According to the defendant, here again Congress once again indicated its interest in export incentives and not domestic subsidies which do not have the effect of distorting trade.

But this argument, too, is devoid of merit. For § 1303(d)(1) does *not* represent the Congressional notion of what the present countervailing statute was intended to reach; rather it describes a trade negotiation *objective*.

This is made even more clear by the Senate Finance Committee Report on the *Trade Reform Act of 1974* (H.R. 10710), S.Rep.No.93–1298, 93d Cong., 2d Sess. 183 (1974). The entire Report is written and arranged in such a manner as to reveal that the Senate Finance Committee, by its recommended amendments to the countervailing duty law, sought to accomplish two

objectives: one, the vigorous enforcement of the law, as written, and two, the negotiation of an international agreement.

The Report begins with three introductory paragraphs. The first paragraph discusses the need for tightening the law as it existed. The second paragraph reads as follows (S.Rep.No.93–1298, *supra,* at 183; U.S.Code Cong. & Admin.News 1974, p. 7318):

> The Committee recognizes that the issues involved in applying the countervailing duty law are complex, and that, internationally, there is the lack of any satisfactory agreement on what constitutes a fair, as opposed to an "unfair," subsidy. In the long run, United States interests will be best served by an international agreement to eliminate subsidies which distort world trade patterns and discriminate against United States sales both at home and abroad. Central to the forthcoming multilateral negotiations should be the establishment of acceptable international rules governing the use of subsidies. This is particularly important because of the strong possibility that oil importing nations will be tempted to subsidize their manufactured goods exports in order to pay for their "oil deficits."[11]

The third paragraph of the Report discusses the need for flexibility in applying the tightened law while negotiations of an international agreement were in progress. *Id.* at 183. These three paragraphs were then followed by several numbered sections, the first six of which described ways in which the Committee amendments were intended to improve the enforcement of the law. *Id.* at 183–185.

In the seventh section, the Committee elucidated on its dual objective, as follows (*id.* at 185; U.S.Code Cong. & Admin.News 1974, p. 7320):

> The provisions outlined above are designed to tighten the administration of the countervailing duty law. As noted, a

second concern of the Committee is the need to establish internationally acceptable rules and procedures governing the use of subsidies and imposition of countervailing duties.

The Committee then proceeded to amplify this "second concern" and stated that "the interests of the United States will be best served by international agreement permanently eliminating the use of governmental subsidies which distort trade patterns." *Id.* at 186; U.S.Code Cong. & Admin.News 1974, p. 7321. The obvious Congressional concern over trade distortive subsidies is the deleterious effect that such subsidies would have on domestic producers and workers. See *id.* at 183. However, the Committee and ultimately the Congress made it clear that *until an international agreement was reached,* the countervailing duty law *was to be enforced as written* and that bounties or grants (bestowed by governments or private citizens) would be countervailable whether or not they caused "adverse effects", although the reduction or elimination of such adverse effects could be cause, under certain circumstances, for the suspension of assessment of countervailing duties.

*The Cases Do Not Support Defendant's Position that the Countervailing Duty Statute was Intended to Reach Only Those Actions which have the Effect of Distorting International Trade*

Defendant relies on *Downs v. United States, supra,* 187 U.S. 496, 23 S.Ct. 222, 47 L.Ed. 275; *Nicholas & Co. v. United States, supra,* 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461; and *United States v. Zenith Radio Corp.,* 562 F.2d 1209, 64 CCPA 130, C.A.D. 1195 (1977), *aff'd* 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978), for the proposition that the countervailing duty statute was intended to reach *only* those actions which have the effect of distorting interna-

---

**11.** In *ASG Industries, et al. v. United States,* 467 F.Supp. 1187, 82 Cust.Ct. ——, C.D. 4782 (1979), *appeal pending,* Judge Ford of this court relied in part on this paragraph of the Senate Finance Committee Report in holding that bounties or grants on float glass produced in West Germany were not countervailable on the ground that they did not tend to distort international trade. See at 1193.

tional trade. However, these cases do not support that proposition. Not only were *Downs* and *Nicholas* decided at a time when the countervailing duty law reached bounties or grants upon exportation only, but these cases made clear that the statute was extremely broad, was intended to cover all benefits conferred on exportation, and was not conditioned on an examination as to whether a particular government program did in fact lead to increased export performance. The Board of General Appraisers in *Downs* also had made clear its understanding that the term "bounty or grant" covered any Governmentally-conferred benefit or favor. *Downs v. United States, supra,* 4 Treas.Dec. at 406–409. What is more, the record in *Downs* showed that exports of Russian sugar *decreased* since the scheme in issue. See dissenting opinion of General Appraiser Tichenor, 4 Treas.Dec. at 419. But this was of no consequence in *Downs. Cf. ASG Industries, et al. v. United States, supra,* C.D. 4782, at 1194.

In *Nicholas,* the Supreme Court (and the lower courts) also construed the law very broadly, 249 U.S. at 39, 39 S.Ct. 34, expressing the understanding that the purpose of the then-existing countervailing duty statute was the prevention of an unequal competition in our domestic market with products of other countries which give to their manufacturers some special advantage.

Defendant's reliance on *Zenith* is also misplaced. There the Court of Customs and Patent Appeals and the Supreme Court held that the non-excessive remission of an indirect tax upon exportation was not a bounty or grant. The reasons for the holding were (1) the long-continued, uniform interpretation of the statute by the Secretary of the Treasury which interpretation was entitled to great weight; (2) the legislative history of the statute which suggested that the term "bounty" was not intended to encompass the non-excessive remission of an indirect tax; and (3) the Secretary's contemporaneous and long-standing interpretation was considered reasonable in light of the statutory purpose of the countervailing duty act. Neither the Court of Customs and Patent Appeals nor the Supreme Court

in *Zenith* even remotely suggested that the countervailing duty statute reaches only those alleged bounties or grants which have the effect of distorting international trade.

██ Despite these considerations, defendant insists that the Secretary of the Treasury's *present* interpretation of the countervailing duty law as reaching only those actions which have the effect of distorting international trade is entitled to great weight. Citing *Zuber v. Allen,* 396 U.S. 168, 192–193, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969), defendant has asserted that the "principle" of deference to administrative interpretation is especially applicable here since the 1922 amendment, which added the terms "manufacture or production" to the statute, was enacted pursuant to a Treasury Department request. However, as previously discussed, in an interpretation made contemporaneously with the enactment of the 1922 amendment, the Secretary of the Treasury did not require an inquiry into the trade effects of a bounty or grant upon manufacture or production. See T.D. 39722 (1923) and T.D. 40001 (1924), *supra.* See also T.D. 50093 (1940) and T.D. 53182 (1953), *supra.* Moreover, as noted in *Zuber v. Allen,* 396 U.S. at 192, 90 S.Ct. at 327, administrative construction "is only one input in the international equation." The courts will not defer to an administrative interpretation of a statute when it is inconsistent with the statutory language or the Congressional purpose and intent. *Securities and Exchange Commission v. Sloan,* 436 U.S. 103, 98 S.Ct. 1702, 56 L.Ed.2d 148, 46 L.W. 4426 (May 15, 1978); *Morton v. Ruiz,* 415 U.S. 199, 237, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974); *Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 94–95, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973); *Red Lion Broadcasting Co. v. F. C. C.,* 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *Suwannee Steamship Company v. United States,* 435 F.Supp. 389, 393, 79 Cust.Ct. 19, 25, C.D. 4708 (1977).

██ Here the Secretary's interpretation cannot be harmonized with the statutory language or Congressional purpose. The statute expressly requires a countervailing

duty "[w]henever any country * * * shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production * * *." The purpose of the statute is, indisputably, to protect domestic producers from import competition which has benefited from bounties or grants. The grants in issue are indisputably bestowed upon manufacture or production and enable foreign product to be sold for less than it otherwise could be in competition with domestic product in the United States.

██ Notwithstanding the foregoing, defendant argues that the Secretary's present interpretation is reasonable and that a failure to inquire into the international trade effects of foreign government programs would result in an intrusion into the domestic affairs of foreign countries, and the imposition of an economic penalty on foreign domestic programs.[12] However, in view of the statutory language, the legislative history, the prior administrative constructions, and the overall purpose of the statute, the Secretary of the Treasury's present interpretation can in no wise be deemed reasonable.

Moreover, the Secretary's *present* interpretation is directly contrary to his order of January 2, 1979, 44 Fed.Reg. 141, *supra,* p. 1221. For in that order (as previously discussed), the Secretary required the imposition of countervailing duties on dutiable merchandise on which bounties or grants had been paid even *though* the Secretary had previously determined pursuant to his waiver authority that such bounties or grants lacked an adverse effect. Considered in this light, the inescapable conclusion is that the Secretary's *present* interpre-

tation—that Congress intended the countervailing duty statute to reach only those bounties or grants that have an adverse effect—is simply an *ipse dixit,* deference to which would be judicial abdication.

### The Hammond Lead Case

Defendant further asserts that the Secretary of the Treasury must exercise judgment in interpreting the countervailing duty statute. Continuing with this argument, defendant insists that Congress has given the Secretary of the Treasury broad discretion in interpreting the statutory terms "bounty" and "grant." In support of this position, defendant relies on *United States v. Hammond Lead Products,* 440 F.2d 1024, 58 CCPA 129, C.A.D. 1017 (1971), *cert. den.,* 404 U.S. 1005, 92 S.Ct. 565, 30 L.Ed.2d 558 (1971) and on the following observations by the Court of Customs and Patent Appeals in *United States v. Zenith Radio Corp.,* 562 F.2d 1209, 64 CCPA 130, C.A.D. 1195 (1977), the *holding* in which was affirmed by the Supreme Court, 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978):

Congress' intent to provide a wide latitude, within which the Secretary of the Treasury (Secretary) may determine the existence or non-existence of a bounty or a grant, is clear from the statute itself, and from the congressional refusal to define the words "bounty," "grant," or "net amount," in the statute or anywhere else, for almost 80 years. [64 CCPA at 138.]

* * * * * *

* * * Not without reason has Congress refrained from spelling out either

12. Contrary to defendant's argument, an affirmative countervailing duty order does not constitute an indictment of another nation's policies—domestic or foreign; it does not constitute an attempt by the United States "to dictate domestic policy to hundreds of sovereign nations"; it does not result in the imposition of an economic penalty. See S.Rep.No.92–1221, 92d Cong.2d Sess. 8 (1972). Rather, it represents merely an effort to offset any advantage conferred by foreign government programs upon the manufacture, production or

export of goods, imported into this nation. If a small quantity of Italian float glass, produced by SIV, is imported into the United States, only a small amount of countervailing duty would be collected—to neutralize the benefits received vis-a-vis the United States competitors of SIV. A failure to impose countervailing duties would be to frustrate the Congressional purpose of preventing "an unequal competition in our domestic market with the products of other countries * * *." *Nicholas & Co. v. United States, supra,* 29 Treas.Dec. at 62.

the precise criteria for determining what shall constitute a bounty or grant and what shall not, or the calculations to be followed in determining net amount. As this court said in *Hammond Lead,* supra note 11: "In the assessment of a countervailing duty, the determination that a bounty or grant is paid necessarily involves judgments in the political, legislative or policy spheres," 440 F.2d at 1030, 58 CCPA at 137, to which the court might well have added the eminently important economic sphere. Our nation's relationships in the world family are particularly sensitive to the assessment of the additional duties known as "countervailing" duties. Such assessment is not just a means of protecting our producers, as Congress has recognized in refusing to require proof of injury before making such assessment; it is also one of the chips in a game played by governments on a world stage. Presumably enacting and reenacting § 303 in this broad light, illuminative of the statute's role in the world, Congress in its wisdom has simply refrained from calling all the countervailing duty plays in advance. [562 F.2d at 1216, 1217, 64 CCPA at 140.]

In *ASG Industries, et al. v. United States,* C.D. 4782, *supra,* Judge Ford relied heavily on *Hammond Lead* and the above quoted language in *Zenith* in holding that bounties or grants on float glass produced in West Germany were not countervailable on the ground that they did not tend to distort international trade. At 1192–1193. And in *ASG Industries, et al. v. United States,* 467 F.Supp. 1195, 82 Cust.Ct. ––––, C.D. 4788 (1979), *appeal pending,* Judge Landis of this court also placed heavy reliance on *Hammond Lead* and *Zenith* (at 1198–1200) in holding that benefits extended to a British float glass producer under a Great Britain regional development program did not constitute bounties or grants on the basis that the Secretary of the Treasury had wide discretion in determining what acts of foreign governments confer bounties or grants and that in the instant case the

Secretary's interpretation was sufficiently reasonable.

Because of the significance thus afforded *Hammond Lead* in the foregoing observations in *Zenith* and in the above *ASG* cases, a full understanding of the *Hammond Lead* case and the Congressional action resulting therefrom becomes important.

In that case, *Hammond Lead,* a domestic manufacturer of litharge—a lead oxide—filed a complaint with the Commissioner of Customs pursuant to section 516(b) of the Tariff Act of 1930 (19 U.S.C. § 1516(b)) to the effect that litharge imported from Mexico was the recipient of a bounty or grant from the Mexican Government, thus requiring the imposition of countervailing duties under section 303. The Commissioner, acting for the Secretary of the Treasury, declined to impose such duties, whereupon *Hammond Lead* brought an action in this court. The government and party-in-interest moved to dismiss on the ground that this court lacked jurisdiction of the subject matter of an American manufacturer's protest which complained that the Secretary failed to invoke a countervailing duty. Motions to dismiss were denied by this court in a rather extensive opinion. *Hammond Lead Products v. United States,* 289 F.Supp. 533, 61 Cust.Ct. 137, C.D. 3552 (1968). Trial on the merits followed. Thereafter, this court sustained *Hammond Lead's* protest on the theory that there was a bounty or grant on export of the litharge from Mexico and ordered the imposition of countervailing duties. *Hammond Lead Products v. United States,* 63 Cust.Ct. 316, C.D. 3915 (1969).

On appeal, the Court of Customs and Patent Appeals, by a 3–2 vote, reversed and held that this court lacked jurisdiction. *United States v. Hammond Lead Products, supra,* 440 F.2d 1024, 58 CCPA 129. The court concluded (*id.,* 440 F.2d at 1030, 58 CCPA at 137):

All considered, it appears that countervailing duty is a *penal exaction* that the Congress did not intend the courts to impose, should the Treasury be recalcitrant, in a 516(b) proceeding, and is not a

"duty" within the meaning of that section.[13] [Emphasis added.]

Further, we note that Article III courts should abstain if possible from passing on controversies not essentially judicial in nature. *Cf. Glidden v. Zdanok*, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962). In the assessment of a countervailing duty, the determination that a bounty or grant is paid necessarily involves judgments in the political, legislative, or policy spheres. In *Glidden v. Zdanok, supra,* the review of Tariff Commission determinations under the Tariff Act of 1930, section 337, 19 U.S.C. § 1337, was held nonjudicial business. Therefore, if doubtful, the question of jurisdiction here should be resolved against jurisdiction.

The court then continued (*id.*, 440 F.2d at 1031, 58 CCPA at 138–140):

The Congress is, of course, well aware of these problems, and it would seem it elects to rely on executive discretion to avoid making the United States ridiculous by penalizing imports from foreign countries which have taken reasonable action, action our own government takes or counsels, countervailing duties are strong medicine, well calculated to arouse violent resentment in countries whose trade practices are branded by the court as unethical. In what has been hitherto the regular practice of the Treasury Department making the decision to assess countervailing duties, the decisions, not necessarily partisan political, but political in a broad sense, legislative, or of a policy nature, can be made by an agency that is equipped and staffed to make them. There can be no doubt that the Secretary is under a legal duty to assess countervailing duties if he sees a bounty or grant being paid, but we think he does and must exercise some discretion in defining what acts of foreign governments confer bounties or grants, when the case is doubtful. We think too, that the question whether an indirect bounty or grant

is paid does not lend itself to a legal answer without the help of other disciplines. Courts that appeared to deal with the issue as purely legal, hitherto have had the benefit and help of Treasury expertise, since the issue has always come up under section 514, on an importer's protest of a Treasury action. Courts, reviewing the Treasury decision, need not redo the whole thing but could concentrate on the aspects susceptible of judicial resolution.

Thus the true Congressional intent, with respect to section 303, we believe contemplates some moderate degree of executive discretion in defining what sort of foreign governmental actions constitute indirect bounties or grants. An alleged indirect bounty or grant reasonably not seen as such by the executive is a case outside the contemplation of Congress. Instances of cases outside the scheme and purpose of Congress but within the literal language of Federal statutes, or vice versa, are not uncommon and courts are required to deal with them: *e. g., Church of the Holy Trinity v. United States*, 143 U.S. 457, 459, 36 S.Ct. 226, 36 L.Ed. 344 (1892); *Helvering v. Hammel*, 311 U.S. 504, 510–11, 61 S.Ct. 368, 85 L.Ed. 303 (1934); *Select Tire Salvage Co. v. United States*, 386 F.2d 1008, 181 Ct.Cl. 695 (1967). A classic case in this court is *Procter & Gamble Mfg. Co. v. United States*, 19 CCPA 415, T.D. 45578 (1932), *cert. denied*, 287 U.S. 629, 53 S.Ct. 82, 77 L.Ed. 546, in which it was held, because the statutory scheme as a whole so required, that whale oil produced on the high seas was "imported from a foreign country."

It seems to us to be thus outside the contemplation of Congress, therefore, that anyone should bypass the executive branch in this class of case, by invoking 516(b) procedure as was done here. In the generations of those who wrote sections 303 and 516(b), no one seems to have thought of doing it. It had to wait

---

**13.** The statement that a countervailing duty was "penal" was repudiated in a 1972 Senate Finance Committee Report discussed *infra.*

until those who had any personal contact with these Congressional actions had gone to their rewards. We think the fit of 303 and 516(b) is not so close as to show by themselves that in framing either the other was in contemplation, and legislative history does not help. The dealing with countervailing duties in the General Agreement on Tariffs and Trade, Par. 4 of Article VI, 61 Stat. A 11 (1947) seems to reflect a belief on the part of Treasury in 1947 that it could veto an assessment of countervailing duties if it chose, and Congress has not since enacted anything to contradict that assumption.

Finally, the court made the following concluding observations by way of dictum (*id.* 440 F.2d at 1032–33, 58 CCPA at 140–141):

It may be asked, if our interpretation of section 516(b) is correct, does it leave the American Manufacturer entirely remediless even in case of an arbitrary and capricious refusal by Treasury to take appropriate action under the countervailing duty law. It is difficult to answer the question without deciding in dictum cases not before us, but a few observations will be made. The Second Circuit, in *J. C. Penney Company, Inc. v. United States*, 439 F.2d 63 (1971), has considered the new statute and reaffirmed holdings under the old, that the regular Federal courts will not interfere in customs cases reviewable in the Customs Court, because an importer desires to tailor a remedy more satisfactory to him than the Customs Court affords. A case of an American Manufacturer having no remedy at all in the Customs Court is greatly different. It is anomalous for anyone but the Government and the taxpayer to have a litigable interest in the assessment of a tax. However, the Congress has recognized the strong economic interest of domestic industry in the maintenance of adequate protective duties, and has fashioned a special remedy in limited circumstances. It is candidly not co-extensive with the importer's protest in significant respects, for example, in being denied retroactive effect. It has been held to be

"[the] grant of an extraordinary privilege which must be strictly construed against the grantee." *Cronite Co., Inc. v. United States*, 150 F.Supp. 754, 38 Cust.Ct. 76, 83, C.D. 1847 (1957), per Lawrence, J.). The Congress may well have intended the scope of section 516(b) to be all the scope to litigate the domestic industry should be allowed to have. Of course, any customs exaction benefits the domestic industry to the extent it hinders the importer and weakens him financially and as a competitor. The need of the domestic industry for full enforcement of regular duties, however, might have appeared to Congress much greater than in the case of penal or retaliatory exactions. The former may be the basis on which capital is invested and production planned. No one would depend on the continuance of an exaction, the very purpose of which is to end the practice that called it into being. Thus it may be that any decision limiting 516(b) may correspondingly limit the access of a complaining domestic industry to any kind of court relief. On the other hand, the modern tendency to fashion a remedy for any injury is a strong one, and it could be the regular courts would take jurisdiction in cases outside section 516(b), where the domestic industry showed clear illegality and substantial injury. Such a proceeding would not be a *de novo* determination like the one the court below made here, but would, we think, be more in the nature of a review of the administrative decision, which would be overturned only if found arbitrary, capricious, or not founded on substantial evidence. A court considering the fashioning of such relief would have to consider its need in light of judicial remedies, and also such extra-judicial ones as the domestic industry might have, in resort to the Congress or to the Tariff Commission. We do not undertake to predict the answer.

### The Congressional Action in Response to Hammond Lead

Soon after *Hammond Lead*, Congress took action to overcome the decision. Con-

gress was disturbed not only because of the denial to the American manufacturer of his day in court, but because of the judicial construction that Congress had conferred a broad discretion on the Secretary, when in fact the countervailing duty law had been written in mandatory terms. On June 29, 1972, and September 7, 1972, bills were introduced in the House and Senate respectively to provide for judicial review by American manufacturers of negative countervailing duty determinations. H.R. 15794, 92d Cong., 2d Sess., 118 Cong.Rec. 23484 (1972); S. 3964, 92d Cong., 2d Sess., 118 Cong.Rec. 29695 (1972). In support of the House bill which he introduced, Congressmen Fulton made it clear that he wished to overrule *Hammond Lead* and stated (118 Cong.Rec. 23883 (1972)):

> The effect of that case is to emasculate the countervailing duty law which is designed to offset the artificial competitive advantage of imported products over American-made products by virtue of subsidies given in the exporting country. *While the countervailing duty law is mandatory in its terms* the *Hammond Lead* decision forecloses effective relief to injured domestic producers where Treasury decides for *policy reasons* not to enforce the law or unreasonably delays enforcement. [Emphasis added.]

On the Senate side, Senator Fannin also expressed the desire to overrule *Hammond Lead,* and among other things stated (118 Cong.Rec. 29698 (1972)):

> [In view of *Hammond Lead*] we are faced with a situation where an importer has the right to judicial review under the statute but a domestic manufacturer is denied his day in court.
>
> The amendment that is being introduced today would enable our domestic producers to begin using effectively an instrument that we have already on hand [the countervailing duty statute], one designed for the sole purpose of insuring fair competition.

On September 27, 1972, the Senate added to a minor House-passed tariff bill an amendment providing the judicial review

sought in the other two bills mentioned. See 118 Cong.Rec. 32413–16 (1972). In reporting out the amended bill, the Senate Finance Committee made the following significant remarks (S.Rep.No.92–1221, 92d Cong., 2d Sess. 8 (1972)):

> The Committee amendment providing judicial review to domestic producers in countervailing duty cases is necessitated because of a 1971 decision of the Court of Customs and Patent Appeals (*United States v. Hammond Lead Products, Inc.*) holding that judicial review was not available to American producers in countervailing duty cases. The Committee is concerned that that decision might adversely affect the ability of American producers to obtain meaningful relief against subsized [sic] import competition under the Countervailing Duty Law (section 303 of the Tariff Act) because of administrative inaction or insufficient action, or because of excessive delay in the administrative process.
>
> In addition, importers enjoy the right to judicial review in countervailing duty cases under existing law. The Committee believes that American producers as well as importers should be permitted to have the right to judicial review in countervailing duty cases as a matter of basic equity and fairness, and as a means to *secure administration of the law in keeping with the intent of Congress reflected in the broad, explicit and mandatory terms used in section 303.* [Emphasis added.]
>
> The Countervailing Duty Law requires the Secretary of the Treasury to assess an additional duty on imports of dutiable articles with respect to which a bounty or grant has been paid. The additional duty must be equal to the amount of the bounty or grant, thereby neutralizing the artificial advantage afforded the foreign product by virtue of the subsidy. *Consequently, countervailing duties are not, nor were they ever intended to be, penal in nature: they are remedial in nature inasmuch as they operate to offset the effect of subsidies afforded foreign merchandise.* [Emphasis added.]

Although the amendment was accepted by the House-Senate conferees (H.R.Rep. No.92–1583, 92d Cong., 2d Sess. (1972); S.Rep.No.92–1298, 92d Cong., 2d Sess. (1972)), the bill was not brought to a vote in the House as an accommodation to the Secretary of the Treasury, with the understanding that the matter would be given attention in the context of trade legislation in the next Congress. See 118 Cong.Rec. 37098 (1972). While the Executive Branch's trade legislation proposal of April 1973 contained no provision for judicial review of negative countervailing duty determinations, Congress provided one in the Trade Act of 1974.[14]

Finally, not only did Congress set time limits and provide for judicial review over negative determinations, in an effort to eliminate any "policy" options Treasury may have assumed for itself in administering the countervailing duty law, but Congress also explicitly limited the discretion of the Secretary of the Treasury. The trade bill proposed by the Executive Branch in 1973 contained a provision which would have given the Secretary of the Treasury the discretion to refrain from ordering the assessment of countervailing duties if he determined that the imposition of such duties would result or be likely to result in significant detriment to the economic interests of the United States. H.R. 6767, 93d Cong., 1st Sess., § 330 (1973). *This proposal was rejected by Congress.* The House of Representatives instead passed a bill which would have authorized the Secretary of the Treasury to suspend the imposition of countervailing duties if he determined that such imposition would be likely to seriously jeopardize the satisfactory completion of contemplated international trade negotiations.

H.R. 10710, 93d Cong., 1st Sess., § 331 (1973). *However, even this proposed grant of limited discretion was not found acceptable to the Senate, because it failed to protect sufficiently the needs of domestic industry.* See S.Rep.No.93–1298, 93d Cong., 2d Sess. 186 (1974). The Senate replaced the House proposal with a much more limited grant of discretion to postpone countervailing duty assessments. It was the Senate version which became law. See section 303(d)(2) and (e) of the Tariff Act of 1930, as amended (19 U.S.C. § 1303(d)(2) and (e)). Furthermore, any exercise of the "postponement" authority was subject to immediate review and veto by either House of Congress. See section 303(e) of the Tariff Act of 1930, as amended (19 U.S.C. § 1303(e)).

With the enactment of the Trade Act of 1974, Congress required Treasury to reach a final countervailing duty determination within one year of the filing of the petition. 19 U.S.C. § 1303(a)(4). By taking this action, Congress wished to prevent the Treasury Department from pursuing past practice "to stretch out or even shelve countervailing duty investigations ·for reasons which have nothing to do with the *clear and mandatory* nature of the countervailing duty law." S.Rep.No.93–1298, 93d Cong., 2d Sess. 183 (1974); U.S.Code Cong. & Admin.News 1974, p. 7318.[15] [Emphasis added.]

In this setting, it is thus clear that Congress intended that, until further amendment and absent the three specified conditions precedent to the invocation of the discretionary authority in 19 U.S.C. § 1303(d)(2), the countervailing duty law be enforced on the basis of the *unambiguous* statutory language and the case law con-

---

**14.** The House Ways and Means Committee expressed views similar to those that the Senate Finance Committee expressed in S.Rep.No.92–1221, *supra,* in 1972. H.R.Rep.No.93–571, 93d Cong., 1st Sess. 76 (1973). In its 1974 report on the trade bill, the Senate Finance Committee was particularly emphatic in its discussion of the need to assure protection to United States producers against bounty-fed foreign competition. See S.Rep.No.93–1298, 93d Cong., 2d Sess. 183 (1974).

**15.** Also in the Trade Act, Congress provided for judicial review of negative countervailing duty determinations in order "to assure effective protection under the countervailing duty ·laws to American producers." S.Rep.No.93–1298, *supra,* at 185; U.S.Code Cong. & Admin.News 1974, p. 7320.

struing it. Put otherwise, Congress did *not* intend to give the Secretary. of the Treasury a broad grant of discretion in interpreting the statutory terms "bounty" or "grant." Rather, Congress intended precisely the contrary.

Nothing the Supreme Court said in *Zenith* detracts from the foregoing. In *Zenith,* as previously noted, the Court held that the non-excessive remission of an indirect tax upon exportation was not a bounty or grant. As basis for this holding the Court concluded that the Secretary's interpretation that such remission was not a bounty or grant was a reasonable interpretation in view of the Treasury Department's consistent 80-year old practice, Congressional unwillingness to amend the law (i. e., overrule the practice), the legislative history of the 1897 legislation, which in the Court's view indicated Congressional understanding that the non-excessive remission of indirect taxes on export was not countervailable, and the absence of any conflict between the Secretary's interpretation and the Congressional purpose or statutory language.

██ In the present case, by contrast, the Secretary's interpretation is not supported by a long-established practice. Rather (as previously discussed) the practice developed by the Treasury Department with the introduction of the relevant statutory language in 1922 excluded any consideration of trade effects. Secondly, there is an absence of legislative history supporting defendant's position; rather the legislative history contravenes it. Thirdly, there is an irreconcilable conflict between the Secretary's interpretation and the Congressional purpose. The purpose of the law is to prevent unequal competition in our markets—to prevent foreign goods from competing with domestic goods at a lower price than they would otherwise be sold. Finally, there is an irreconcilable conflict between the Secretary's interpretation and the statutory language.

It is to be added that in *Zenith* the manufacturer-importer argued that the non-excessive remission of an indirect tax had a similar economic effect in inducing exports as remission of a direct tax which concededly was countervailable and that as a consequence remission of the indirect tax was within the scope of the countervailing duty statute. Responding to this argument, the Supreme Court stated (437 U.S. at 458–459, 98 S.Ct. at 2449):

Aside from the contention, discussed in Part III, *infra,* that the Department's construction is inconsistent with this Court's decisions, petitioner's sole argument is that the Department's position is premised on false economic assumptions that should be rejected by the courts. In particular, petitioner points to "modern" economic theory suggesting that remission of indirect taxes may create an incentive to export in some circumstances, and to recent criticism of the GATT rules as favoring producers in countries that rely more heavily on indirect than on direct taxes. * * * But, even assuming that these arguments are at all relevant in view of the legislative history of the 1897 provision and the longstanding administrative construction of the statute, they do not demonstrate the unreasonableness of the Secretary's current position. Even "modern" economists do not agree on the ultimate economic effect of remitting indirect taxes, and—given the present state of economic knowledge—it may be difficult, if not impossible, to measure the precise effect in any particular case. See, *e. g.,* Executive Branch GATT Studies, *supra,* at 13–14, 17; Marks & Malmgren, Negotiating Nontariff Distortions to Trade, 7 L. & Policy in Int'l Bus. 351 (1975). More fundamentally, as the Senate Committee with responsibility in this area recently stated, "the issues involved in applying the countervailing duty law are complex, and . . internationally, there is [a] lack of any satisfactory agreement on what constitutes a fair, as opposed to an 'unfair,' subsidy." S.Rep.No.93–1298, p. 183 (1974). In this situation, it is not the task of the judiciary to substitute its views as to fairness and economic effect for those of the Secretary.

What the Court was saying in effect was that since there were economic arguments to be made on both sides as to whether the non-excessive remission of an indirect tax creates an incentive to export, the Court would not contribute its own economic analysis but rather would defer to the Secretary. But before the Court deferred to the Secretary, it satisfied itself that the Secretary's interpretation of the statute was a reasonable interpretation in view of the Treasury Department's consistent 80-year old practice, Congressional unwillingness to overrule the practice, the legislative history, and the absence of any conflict between the Secretary's interpretation and the Congressional purpose or statutory language.

Moreover, the above quoted statement of the Supreme Court is entirely irrelevant here. In *Zenith* the Court was concerned with a claimed bounty or grant upon *export* while here we are concerned with a grant upon *production.* And in the latter connection, the economic benefits extended SIV by the Italian Government are concededly "grants" within the dictionary meaning of that term and are more than *de minimis.* This being the case, whether or not their economic effect is to distort international trade or to induce exports is immaterial. For, as explained in detail, such a bounty or grant is within the reach of the countervailing duty without regard to its trade effects.

What this all comes down to in the final analysis is that the Secretary of the Treasury's refusal to require the imposition of countervailing duties in the present case not only ignored completely the Congressional mandate contained in section 303 of the Tariff Act of 1930, as amended, it rendered meaningless the waiver provisions of the Trade Act of 1974. The point is that once the Secretary found that a bounty or grant lacked an adverse effect, his sole alternative under the statutory scheme was to impose countervailing duties or to issue a waiver pursuant to the authority contained in the 1974 Trade Act—which waiver, of course, was subject to veto by either House of Congress. Failing to make a waiver determination, the Secretary's obligation was clear and unmistakable—to require the assessment of countervailing duties. And, as previously pointed out, this obligation the Secretary himself recognized by his order of January 2, 1979 (the day before the expiration of the waiver authority under the 1974 Trade Act) in which he required the assessment of countervailing duties on a host of bountied importations that had previously been subject to waiver because of their lack of adverse effect. See, *supra*, p. 1221. The conclusion thus becomes inescapable that to uphold the defendant's position in the present case—that section 303 does *not* reach bounties or grants that do *not* have an adverse effect—would mean that even should Congress extend the waiver authority of the Trade Act of 1974,[16] such enactment would be an empty gesture. For the Secretary could bypass altogether the Congressional scrutiny mandated by the waiver provision and refuse to impose countervailing duties (just as he has refused to impose such duties here and in the other *ASG* cases) on the ground that the countervailing duty statute does not cover bounties or grants that do not have an adverse effect on international trade.

### Scope of Review

Defendant further argues that the scope of review in this case is limited to the question of whether the Secretary's decision was arbitrary or capricious and that a *de novo* determination on the merits is precluded. Again this argument is without merit. It ignores the fact that every countervailing duty case litigated—just as every tariff classification and valuation case (in modern times)—has been tried *de novo* either before this court or the Board of General Appraisers. Judicial review of countervailing duty determinations has never been upon an administrative record; there

---

16. It is to be noted that on March 1, 1979, the House approved H.R. 1147 which extended the waiver provision to whichever of certain dates first occurred. See 125 Cong.Rec. H 1018–H 1025 (daily ed. March 1, 1979). On March 28, 1979, the Senate approved the bill. See N.Y. Times, March 29, 1979, p. D12.

is no "administrative record" · in such cases—no evidentiary hearings, no evidentiary findings, no cross-examination of witnesses. If an importer wishes to challenge the assessment of countervailing duties on the ground that no bounty or grant was bestowed, he has the right to adduce evidence and he also has the burden of proof. · E. g., *Mueller & Co. v. United States,* 28 CCPA 249, 257, C.A.D. 152 (1940); *American Express Company v. United States,* 332 F.Supp. 191, 67 Cust.Ct. 141, C.D. 4266 (1971), *aff'd* 472 F.2d 1050, 60 CCPA 86, C.A.D. 1087 (1973). See also, e. g., *Michelin Tire Corporation v. United States,* 469 F.Supp. 270, 82 Cust.Ct. ——, C.R.D. 79–6 (1979), *writs of mandamus and prohibition pending.* Thus in *Mueller,* where an importer challenged the assessment of countervailing duties, the Court of Customs and Patent Appeals stated (28 CCPA at 257):

> We do not mean to be understood as holding that appellant [importer]· had not the right to bring forward any questions of fact relating to the transaction and have them tested by the applicable law, but the burden of showing the facts in detail rested upon it, and it was not incumbent upon the Secretary to go further than he went in this regard.[17]

Furthermore, and quite apart from historical (and statutory) considerations, the Supreme Court has indicated that *de novo* review is appropriate where there are inadequate factfinding procedures in an adjudicatory proceeding. E. g., *Camp v. Pitts,* 411 U.S. 138, 141–142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Thus, although a countervailing duty investigation "is in the nature of a fact-finding activity rather than rule making," *American Express Co. v. United States, supra,* 472 F.2d at 1056, 60 CCPA at 93, and the factfinding procedures are inadequate—secrecy, no hearings on the record, no cross-examination, no evidentiary findings—there is available a full trial *de novo* in this court.

These considerations are particularly applicable to the present case. For example, after a "final" *affirmative* duty order was published in this case on January 7, 1976 with respect to float glass produced by SIV, the Secretary of the Treasury had communications with the Italian Government in the course of which he received from that Government certain representations on which he relied heavily in superseding his once "final" *affirmative* determination with a "final" *negative* determination here in issue. What is significant is that at no time prior to his "final" *negative* decision did the Secretary advise the petitioners (plaintiffs here) that he had obtained this information from the Italian Government so as to enable the petitioners to file any kind of a reply. It is quite true that nothing in the statute required the Secretary to make available to any interested party any of the information he gathered. However, were there any validity to defendant's position that judicial review of the Secretary's decision must be limited to the administrative record and a trial prohibited, elementary principles of fairness would have required the Secretary to afford the petitioners an opportunity to comment or be heard on the Italian Government's representations before making his decision. The fact that the petitioners were denied this opportunity makes it even more apparent that there was no "administrative record" and that the factfinding procedures were entirely inadequate, characterized as they were by secre-

---

**17.** When the Senate Finance Committee reported out what was to become the Trade Act of 1974, the Committee introduced an amendment to section 516 of the Tariff Act of 1930 (19 U.S.C. § 1516(d)), providing for judicial review over *negative* countervailing duty determinations. See S.Rep.No.93–1298, 93d Cong., 2d Sess. 260–261 (1974). In addition to providing American manufacturers with a tool to enforce the clear, explicit, and mandatory countervailing duty statute, the amended section 516 was clearly intended to give American manufacturers the *same right* to judicial review over negative countervailing duty determinations that importers had (and have) over affirmative countervailing duty determinations. See S.Rep.No.93–1298, 93d Cong., 2d Sess. 260–261 (1974) 183, 185; H.R.Rep.No.93–571, 93d Cong., 1st Sess. 76 (1973); S.Rep.No.92–1221, 92d Cong., 1st Sess. 8 (1972). ,

cy, no hearings, formal or informal, and no evidentiary findings.

I am quite mindful that in *American Express,* the Court of Customs and Patent Appeals affirmed this court's decision "on the basis on which * * * [the Secretary of the Treasury] relied." 472 F.2d at 1057, 60 CCPA at 95. However, this does not mean that the appellate court approved of review upon the administrative record. Rather, the court was simply indicating its agreement with the Secretary's legal reasoning. In fact (as previously indicated) in *American Express* a trial *de novo* was held before this court and stipulations of facts were entered into. See *American Express Company v. United States, supra,* 332 F.Supp. 191, 67 Cust.Ct. 141. And this without the slightest hint of disapproval by the appellate court.

What is more, in *American Express* the government itself took the position in its brief before this court (br. p. 46) that "[t]he Secretary is not required to make any administrative record nor to submit one to the Customs Court for review." "Indeed," the government added, "the Customs Court having *de novo* jurisdiction, such a record would be *irrelevant* before this tribunal." [Emphasis added.] In a similar vein, the government argued before the Court of Customs and Patent Appeals in *American Express* (br. pp. 66–67):

> Under the provisions relating to adjudicative actions, 5 U.S.C. 554, no hearing or notice of hearing is necessary unless such action is "required by statute to be determined on the record after opportunity for an agency hearing," or, in any event, if such matter is "subject to a subsequent trial of the law and the facts *de novo* in a court." Thus, should the finding of the existence of a bounty or grant be considered adjudication (assuming, *arguendo,* the applicability of the APA), it is clear that the Secretary of the Treasury would not be obliged to hold a hearing prior to the imposition of countervailing duties for two separate and independent reasons: (1) there is no requirement in section 303 for a hearing or notice of hearing, and (2) the determination of the existence of a bounty or grant is triable *de novo* in the Customs Court (*see* V. *Mueller, supra* ).

Instructive in considering the question here is a decision of the Fourth Circuit analyzing the scope of review available in the Tax Court in litigation concerning determinations by the Customs Service's sister agency—the Internal Revenue Service. *O'Dwyer v. Commissioner of Internal Revenue,* 266 F.2d 575 (4th Cir.), *cert. den.,* 361 U.S. 862, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959). The court first quoted the following statement of the Tax Court, with evident approval (*id.* at 579–580):

> This Court is not subject to the Administrative Procedure Act. We do not review in the same sense as other courts perhaps review actions of the Federal Communications Commission or some other federal agency. We do not review in that same manner the determinations of the Commissioner. This is a trial "de novo" and the question before me is simply whether or not the deficiencies determined by the Commissioner are correct. I have no means whatever of bringing before me the entire record, so-called, as you describe it, that was before the Commissioner. In fact, there probably is no such record. *When the Commissioner makes determination, he may have numerous documents before him. The determination may be made on the basis not only of those documents, but also on the basis of various conversations which may or may not be reduced to writing.*[18] *And it would be wholly impractical for this Court to undertake to review what you describe as the record before the Commissioner. There is no such record in any technical sense.* [Emphasis added.]

The Fourth Circuit, in affirming the decision of the Tax Court, proceeded to say (*id.* at 580):

> The provisions of the Administrative Procedure Act must be read and con-

---

18. As previously pointed out, these considerations are fully applicable here.

strued together and we hold that the judicial review of the "whole record" mentioned in Sec. 10(e) envisages, in the case of adjudication, a review of the record made in cases wherein Sections 5, 7 and 8 of the Act (5 U.S.C.A. §§ 1004, 1006, 1007: 60 Stat. 237, at pages 239–240: 241–242) are applicable. Where these sections apply, the administrative agency is required to hold a formal hearing within a strict statutory framework and to make up a record of the testimony and exhibits introduced thereat, upon which record the agency must base its decision. This formal record is the subject of the review provided in Sec. 10. To hold that Sec. 10 applies to a determination of the Commissioner and that the Tax Court is a "reviewing court", within the meaning of that section, would be to hold that such determination is subject to the rigid requirements of Secs. 5, 7 and 8. Without a "record" to review, the provisions of Sec. 10(e) would be meaningless and thus inapplicable here.

It has been held that the Bureau of Internal Revenue is exempt from the requirements of Secs. 5, 7 and 8 of the Administrative Procedure Act. *Cohen v. Commissioner of Internal Revenue*, 10 Cir., 1949, 176 F.2d 394; *Kennedy Name Plate Co. v. Commissioner of Internal Revenue*, 9 Cir., 1948, 170 F.2d 196. The Tax Court is given jurisdiction to redetermine the deficiency asserted by the Commissioner, and in doing so it is empowered to prescribe rules of practice and procedure and is required to apply the rules of evidence applicable to nonjury trials in the United States Court of the District of Columbia and make findings of fact upon such evidence. Secs. 6213, 7453 and 7459, Internal Revenue Code of 1954, 26 U.S.C.A. §§ 6213, 7453, 7459. The Tax Court thus renders its decision only upon the evidence produced before it. The burden of proof rests upon the taxpayer, and a decision of the Tax Court based upon the failure to sustain such burden was upheld. *Fairmont Aluminum Co. v. Commissioner*, 22 T.C. 1377, affirmed 4 Cir., 1955, 222 F.2d 622.

The Tax Court, rather than being a "reviewing court", within the meaning of Sec. 10(e) reviewing the "record", is a court in which the facts are triable de novo and the burden is upon the taxpayer to come forward with evidence showing the determination of deficiency to be erroneous. We agree that the Tax Court is not subject to the Administrative Procedure Act.

From what has been said, it must be concluded that *countervailing duty decision-making* in the Customs Service/Treasury Department is quite analogous to the decision-making discussed in *O'Dwyer*. It clearly is *not* decision-making upon a record; it clearly is decision-making subject to *de novo* judicial review.

Instructive also are the following comments by the House Judiciary Committee in reporting out what was to become the Administrative Procedure Act (H.R.Rep.No. 1980, 79th Cong. 2d Sess. 45–46 (1946)):

The sixth category, respecting the establishment of facts upon trial de novo, would require the reviewing court to determine the facts in any case of adjudication not subject to sections 7 and 8 or otherwise required to be reviewed exclusively on the record of a statutory agency hearing. It would also require the judicial determination of facts in connection with rule making or any other conceivable form of agency action to the extent that the facts were relevant to any pertinent issues of law presented. For example, statutes providing for "reparation orders," in which agencies determine damages and award money judgments, usually state that the money orders issued are merely prima facie evidence in the courts and the parties subject to them are permitted to introduce evidence in the court in which the enforcement action is pending. *In other cases, the test is whether there has been a statutory administrative hearing of the facts which is adequate and exclusive for purposes of review. Thus, adjudications such as tax assessments not made upon a statutory administrative hearing and record may involve*

a trial of the facts in the Tax Court or the United States district courts. Where administrative agencies deny parties money to which they are entitled by statute or rule, the claimants may sue as for any other claim and in so doing try out the facts in the Court of Claims or United States district courts as the case may be. Where a court enforces or applies an administrative rule, the party to whom it is applied may for example offer evidence and show the facts upon which he bases a contention that he is not subject to the terms of the rule. Where for example an affected party claims in a judicial proceeding that a rule issued without an administrative hearing (and not required to be issued after such hearing) is invalid for some relevant reason of law, he may show the facts upon which he predicates such invalidity. *In short, where a rule or order is not required by statute to be made after opportunity for agency hearing and to be reviewed solely upon the record thereof, the facts pertinent to any relevant question of law must be tried and determined de novo by the reviewing court respecting either the validity or application of such rule or order because facts necessary to the determination of any relevant question of law must be determined of record somewhere and, if Congress has not provided that an agency shall do so, then the record must be made in court.* [Emphasis added.]

Defendant, however, relies on *Suwannee Steamship Co. v. United States*, 435 F.Supp. 389, 79 Cust.Ct. 19, C.D. 4708 (1977), as support for its position that the scope of review is limited to the question of whether the Secretary's decision was arbitrary or capricious. But *Suwannee* is totally inapposite. In that case, the plaintiff, a steamship company, brought an action in this court to recover customs duties paid on certain repairs made in foreign ports to its vessel. It maintained that the duties should have been remitted by the Secretary of the Treasury because the foreign repairs were the result of a casualty. The relevant statutes were 19 U.S.C. § 257 and § 258 as written prior to January 5, 1971. Duties on the vessel's repairs were assessed pursuant to § 257 which provided in pertinent part:

§ 257. *Duty on equipments or repair parts for vessels.*

The equipments, or any part thereof, including boats, purchased for, or the repair parts or materials to be used, or the expenses of repairs made in a foreign country upon a vessel documented under the laws of the United States to engage in the foreign or coasting trade, or a vessel intended to be employed in such trade, shall, on the first arrival of such vessel in any port of the United States, be liable to entry and the payment of an ad valorem duty of 50 per centum on the cost thereof in such foreign country; * * *.

The plaintiff's application for remission of the duties paid was made under § 258, providing in pertinent part:

§ 258. *Remission for necessary repairs.*

If the owner or master of such vessel furnishes good and sufficient evidence—

(1) That such vessel, while in the regular course of her voyage, was compelled, by stress of weather or other casualty, to put into such foreign port and purchase such equipments, or make such repairs, to secure the safety and seaworthiness of the vessel to enable her to reach her port of destination; * * *

* * * * * *

then the Secretary of the Treasury is authorized to remit or refund such duties, * * *.

The defendant previously moved to dismiss the action asserting that the court lacked jurisdiction. It contended that the statutory authority conferred upon the Secretary of the Treasury to remit repair duties was entirely discretionary, and that the exercise of that discretion was final and not subject to judicial review. The court held, however, that the contention was without merit. *Suwannee Steamship Company v. United States*, 354 F.Supp. 1361, 70 Cust.Ct. 327, C.R.D. 73–3 (1973). The court advanced two reasons for its holding. The

first reason was that there was a strong presumption in favor of judicial review of administrative action and that indeed judicial review of such administrative action was the rule and nonreviewability an exception which must be demonstrated. The second reason set forth by the court was that defendant's assertion that the Secretary's exercise of discretion was judicially unreviewable ignored the mandate of section 706(2)(A) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), which provides:

§ 706. *Scope of Review.*

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

\* \* \* \* \* \*

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, *an abuse of discretion,* or otherwise not in accordance with law; \* \* \*. [Emphasis in original.]

Against this background, the court in the second *Suwannee* case, *supra,* 435 F.Supp. 389, 79 Cust.Ct. 19, concluded (1) that judicial review of administrative action based upon the exercise of discretionary authority is available to assure that the administrative action is not arbitrary, capricious, or an abuse of discretion, or otherwise not in accordance with law; (2) that in cases of express delegation of discretionary authority, where the administrative action is not contrary to law and has a rational basis, the courts will not substitute their judgment for that of the administrator; and (3) that where no formal record of the administrative proceeding is made, the agency determination must be accompanied by an expla-

nation of its action sufficient to enable the reviewing court to determine whether the action was reasonable. Tested by these standards, the court held that the Secretary acted reasonably and did not abuse his discretion by refusing to remit the duties paid on the foreign repairs to the vessel. And since the Secretary's action was not shown to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, the action was dismissed.[19]

From the foregoing, it is apparent that there is a basic difference between *Suwannee* and the situation here. For in *Suwannee,* the Secretary was delegated by the Congress *discretionary* authority. Here, by contrast, it is clear from what has been said that Congress intended in the Trade Act of 1974 that absent the three specified conditions precedent to the invocation of the discretionary waiver authority in 19 U.S.C. § 1303(d)(2), the countervailing duty law be enforced on the basis of the *unambiguous* statutory language and the case law construing it. Put otherwise, Congress did *not* intend to give the Secretary of the Treasury a broad grant of discretion. To the contrary, Congress intended that the countervailing duty statute be enforced "*in keeping with the intent of Congress reflected in the broad, explicit and mandatory terms used in section 303.*" S.Rep.No.92–1221, 92d Cong., 2d Sess. 8 (1972), *supra.* [Emphasis added.] Perhaps, in this regard, it is well to repeat what has been said before that the language of section 303 of the Tariff Act is *mandatory* and that whenever a bounty or grant has been conferred, the Secretary *must* impose countervailing duties.

Defendant also relies on *Pasco Terminals, Inc. v. United States,* 80 Cust.Ct. ——, C.R.D. 78–3 (1978), where this court held that the scope of review of an International Trade Commission's finding of injury under

---

19. In *Michelin v. United States, supra,* 469 F.Supp. at 293 295, C.R.D. 79–6, another judge of this court in dictum disagreed that §§ 257 and 258—covering duty on ship repairs and remissions for necessary repairs—provided *discretionary* authority to the Secretary to re-

mit the duties. Rather, the court in *Michelin* was of the view that the statutory provisions in question were *mandatory* in nature so that the scope of review was via a *de novo* proceeding rather than a review of the administrative record.

the Antidumping Act was, among other things, arbitrary or capricious, an abuse of discretion, or otherwise contrary to law. But there again, a determination of whether or not there was injury under that law is committed by Congress to the sound discretion of the Commission. Furthermore, under the Commission's practice, an administrative record is made, hearings are held, cross-examination of witnesses is permitted and specific and detailed findings are made.

Additionally, defendant relies on the decision of the Court of Customs and Patent Appeals in *Hammond Lead, supra,* as support for its position that review is limited to review of the administrative record. The following dictum in that case is pertinent (440 F.2d at 1032–1033, 58 CCPA at 141):

> The Congress may well have intended the scope of section 516(b) to be all the scope to litigate the domestic industry should be allowed to have. Of course, any customs exaction benefits the domestic industry to the extent it hinders the importer and weakens him financially and as a competitor. The need of the domestic industry for full enforcement of regular duties, however, might have appeared to Congress much greater than in the case of *penal* or *retaliatory exactions.* The former may be the basis on which capital is invested and production planned. No one would depend on the continuance of an exaction, the very purpose of which is to end the practice that called it into being. Thus it may be that any decision limiting 516(b) may correspondingly limit the access of a complaining domestic industry to any kind of court relief. On the other hand, the modern tendency to fashion a remedy for any injury is a strong one, and *it could be the regular courts would take jurisdiction in cases outside section 516(b), where the domestic industry showed clear illegality and substantial injury. Such a proceeding would not be a de novo determination like the one the court below made here, but would, we think, be more in the nature of a review of the administrative decision, which would be overturned only if found arbitrary, capricious, or not founded on substantial evidence.* A court considering the fashioning of such relief would have to consider its need in light of judicial remedies, and also such extra-judicial ones as the domestic industry might have, in resort to the Congress or to the Tariff Commission. We do not undertake to predict the answer. [Emphasis added.]

More specifically, the court in *Hammond Lead* (as previously explained in detail) had determined that an American manufacturer had no right under 19 U.S.C. § 1516 (as it then existed) to challenge negative countervailing duty determinations. It went on to suggest by way of the foregoing dictum that "it could be the regular courts would take jurisdiction in cases *outside* section 516(b), where the domestic industry showed clear illegality and substantial injury." [Emphasis added.] Then, to *contrast* the kind of review that would be available in a district court proceeding with the review available in a section 516 proceeding in this court, the Court of Customs and Patent Appeals pointed out that "[S]uch a proceeding would not be a *de novo* determination like the one the court below made here * * *." Stated differently, the Court of Customs and Patent Appeals did not criticize this court for holding a trial *de novo;* instead, the court indicated that that is the kind of review available in this court (when this court has subject matter jurisdiction).

Finally, it is interesting to note that in 1978, at the request of the Department of Justice, a bill, S. 2857, entitled the Customs Court Act of 1978, was introduced and a hearing held thereon. See hearing before the Subcommittee on Improvements in Judicial Machinery of the Senate Committee on the Judiciary on S. 2857, 95th Cong., 2d Sess. (1978). Section 2640 of the bill provided that if an American manufacturer, producer or wholesaler challenged a decision of the Secretary of the Treasury under the countervailing duty statute that certain imported merchandise had not received the benefit of a bounty or grant, a trial *de novo* would *not* be available but rather, as specified in the Administrative Procedure Act, judicial review would be limited to whether

the Secretary's decision was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. See hearing, *id.* at 25, 26. What is more, the statement of the Department of Justice in explanation of this provision makes it clear that it was *not* intended to be of a *clarifying* nature. Thus, the Department explained (hearing, p. 56):

6. If an American manufacturer, producer, or wholesaler wishes to challenge a decision of the Secretary of the Treasury, under the countervailing duty statute, that certain imported merchandise has not received the benefit of a "bounty or grant," he may do so by means of the procedure specified in subparagraph (d). A trial *de novo will not* be available. Judicial review *will* proceed as specified in the Administrative Procedure Act, except that the "substantial evidence" test will not be applicable. [Emphasis added.]

It is important to add that the bill was *not* enacted.

In sum—and for the reasons indicated—the court rejects the defendant's contention that the scope of review is limited to the question of whether the Secretary's decision was arbitrary or capricious.

█ But even assuming that there is any validity to the defendant's contention—and there is none—the Secretary's negative determination is also arbitrary and capricious and contrary to law. As indicated earlier, none of the factors employed by the Secretary in making this determination is relevant. In fact, as the record makes manifest, defendant has demonstrated (1) an inability to articulate the reason that the ad valorem size of the benefit was a factor in the Secretary's negative determination, when that benefit was admittedly greater than *de minimis;* (2) an inability to articulate the reason that the level of exports was a factor in the Secretary's negative determination when (a) that level was known to the Secretary when he issued his "final" *affirmative* determination on January 7, 1976, (b) that level was greater than *de minimis,* and (c) the amount of bounty per unit exported is the same whether the level

of export is miniscule or great; and (3) an inability to demonstrate that the *effect* of the regional development programs is other than the bestowal of counties or grants, as contemplated by section 303.

With respect to the last point, in an apparent effort to circumvent the teaching of *Nicholas* that the *purpose* of a government program is irrelevant, defendant has asserted that the Secretary took into account the *effects* of the programs, not the *purpose.* Defendant has further asserted that effects were not in the form of *premiums* but rather *offsets,* arguing that the former are countervailable bounties or grants while the latter are not.

Actually, the Secretary made no findings at all with respect to the effects of the Italian programs. All that was said in the published countervailing duty order of March 8, 1977 here in issue was that the Italian Government advised Treasury of certain matters. Further, in its response to the plaintiffs' interrogatory no. 23, defendant said that the Italian Government spoke of design—i. e., *purpose*—of that Government's programs.

█ Finally, to say that the *effect* of the Italian programs was not to provide a premium, but rather to provide an *offset* is irrelevant. In *Nicholas,* the importer made essentially the same argument that the defendant is making here. Nicholas urged that the payments there in issue were not *premiums* but were nothing more than compensation—*offsets*—for certain additional costs experienced by distillers as a result of Great Britain's peculiar and complex excise regulations. The payments, it was argued, did not even compensate the loss they were intended to reimburse. 249 U.S. at 37–38, 39 S.Ct. 218. However, the Supreme Court rejected the argument, stating (*id.* at 39, 39 S.Ct. at 220):

We do not think that it is a repelling answer to say that * * * [the spirits] are sold here at the same price that they would be sold for in the United Kingdom if the latter imposed no tax; that is, sold here as if they had not been taxed at all, and therefore sold not below their natural

cost. This is mere speculation of the effects of a different situation.

The Court was of the view that "[t]here can be * * * but one inquiry: Was something—bounty or grant—paid or bestowed upon the exportation of spirits?", *id.* at 39, 39 S.Ct. at 220, and it answered in the affirmative.

Here, too, there can be but one inquiry: Was something—bounty or grant—paid or bestowed upon the manufacture or production or export of float glass? Defendant has admitted as much. Further inquiry is neither relevant nor necessary.

### *Remand is Not Permissible*

Defendant urges that if this court should determine that the Secretary's decision was erroneous, the court should not proceed to make a determination as to whether a bounty or grant exists, but should stay proceedings and order the Secretary to consider the matter anew. The request is without foundation and is rejected.

In the customs area, this court has always substituted its opinion on matters of law for the opinion of the Secretary of the Treasury or his delegate, when this court believed the latter to be incorrect. When the court disagrees with a tariff classification decision, it does not remand for the purpose of permitting the making of an administrative classification decision consistent with the court's —it orders reliquidation in accordance with the court's decision.

Similarly, in the three countervailing duty cases where the court has disagreed with the Secretary's determination, the court did not remand to permit the Secretary to make a new determination. In *Energetic Worsted Corp. v. United States*, 51 Cust.Ct. 55, C.D. 2413 (1963), *rev'd*, 53 CCPA 36, C.A.D. 874 (1966), this court in its judgment in conformity with the mandate of the Court of Customs and Patent Appeals ordered, adjudged, and decreed that judgment be "entered sustaining the pro-

test claims that the assessment of countervailing duties on the wool tops in question was and is illegal and void, and that the said merchandise is not subject to any countervailing duties, and the district director at the port of Philadelphia is directed to reliquidate the entries accordingly." In *Hammond Lead Products*, 63 Cust.Ct. 315, *supra, rev'd on jurisdictional grounds*, 440 F.2d 1024, 58 CCPA 129, *supra*, this court in its initial judgment ordered, adjudged, and decreed "that the American manufacturer's protest in this case be, and the same hereby is, sustained and the district director of customs at Laredo, Texas, will reliquidate the entry by adding, pursuant to section 303 of the Tariff Act of 1930, an additional duty equal to the amount as found by the Secretary of the Treasury, of the bounty or grant bestowed by the Mexican Government upon the exportation of litharge." And in *Zenith Radio Corporation v. United States*, 430 F.Supp. 242, 78 Cust.Ct. 59, C.D. 4691 (1977), *rev'd*, 562 F.2d 1209, 64 CCPA 130, *supra, aff'd*, 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337, *supra*, this court, in its judgment order, directed the Secretary of the Treasury "to ascertain and determine or estimate the net amounts of the bounty or grant paid or bestowed on the exportation of the subject electronic products from Japan and to order the appropriate customs officers throughout the United States to assess countervailing duties, in said net amounts equal to the said bounty or grant, on the subject electronic products exported from Japan, entered or withdrawn from warehouse for consumption on or after the day following the date of entry of this Order." Indeed, at no time during the *Zenith* litigation did the government question the authority of this court to make the determination that a bounty or grant has been bestowed.

Now, defendant contends—without any basis—that this court should not make that legal determination, and urges a result which cannot be harmonized with (1) subsections (e) and (g) of 19 U.S.C. § 1516; [20]

---

**20.** These subsections make clear the Congressional intention that entries made after the publication of a court decision favorable to the American manufacturer shall be liquidated in

(2) the mandate for expeditious handling of American manufacturers' litigation in 28 U.S.C. § 2633 and 28 U.S.C. § 2602; and (3) the mandate for expeditious handling of countervailing duty cases in 19 U.S.C. § 1303(a)(4).

In support of its request for a stay, defendant relies primarily on *United States v. Bianchi & Co.*, 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963). Such reliance is totally misplaced. *Bianchi* involved the interpretation of the so-called Wunderlich Act which provides in substance that a decision of a government agency on a question of fact pursuant to the "disputes" clause in a government contract shall be final and conclusive unless the decision is arbitrary or capricious or is so grossly erroneous as necessarily to imply bad faith or is not supported by substantial evidence. The controversy arose as follows: A government contractor claimed additional compensation under his contract. The contracting officer denied his claim, whereupon an appeal was taken to the government agency's board of claims and appeals. An adversary hearing was held before the board, at which a record was made, and each side offered its evidence and had an opportunity for cross-examination. 373 U.S. at 711, 83 S.Ct. 1409. The board ruled for the government, following which the contractor filed suit in the Court of Claims. The Court of Claims heard the controversy *de novo* and found for the contractor. The Supreme Court granted the government's petition for certiorari, reversed the Court of Claims, and held that judicial review must rest solely on consideration of the administrative record.

Among other things, the respondent-contractor contended before the Supreme Court that the Court of Claims had no power to remand such a case to the agency concerned and thus if the administrative record was defective or inadequate, or re-

vealed the commission of some prejudicial error, the court could only hold an evidentiary hearing and proceed to judgment. The Supreme Court said there were two answers to this contention. First, there would undoubtedly be situations in which the Court of Claims would be warranted on the basis of the administrative record [21] in granting judgment for the contractor without the need for further administrative action. Second, in situations where the court believed that the existing administrative record did not warrant such a course, but that the agency determination could not be sustained under the standards laid down by Congress, the court could stay its proceedings pending some further action before the agency. Such a stay, the Court continued, would be justified where the agency failed to make adequate provision for a record that could be subject to judicial scrutiny. Concluding, the Court observed that where the agency failed to remedy the particular substantive or procedural defect or inadequacy, the sanction of judgment was always available to the court. 378 U.S. at 717–718, 83 S.Ct. 1409.

Merely to recite this background and holding in *Bianchi* is enough to establish its complete irrelevance here.

The only other case relied on by the defendant in support of a request for a remand is *Voss International Corp. v. United States*, 432 F.Supp. 205, 78 Cust.Ct. 130, C.D. 4698 (1977). In that case, an importer challenged the imposition of special dumping duties. In his first cause of action, he contended that the Tariff Commission's determination of injury was invalid under 19 U.S.C. § 160(a) on the ground that it was achieved by a two to two vote of the five Commissioners who attended the meeting, while the fifth Commissioner present at the meeting declined to vote.[22] Defendant con-

---

accordance with the final judicial decision in the action.

**21.** Here of course, as explained previously, there is no "administrative record" nor is one required.

**22.** 19 U.S.C. § 160(a) provides in relevant part:

* * * For the purposes of this subsection, the [said] [Tariff] Commission shall be deemed to have made an affirmative determination [of injury] *if the Commissioners of the said Commission voting are evenly divided* as to whether its determination should be in the affirmative or in the negative. [Emphasis added.]

tended that the affirmative determination of injury by the Commission was valid, as a matter of law, on the basis of the "evenly divided" provision in 19 U.S.C. § 160(a). Defendant asked, however, in the alternative, that if the court concluded that the Commission determination contained a procedural flaw, the case be remanded to the Commission so as to afford that agency an opportunity to consider again, by way of a new vote, the question of injury. This court granted the alternative request for a remand based on the court's desire to avoid needless judicial controversy. For on remand, had all members of the Commission voted on the injury question or had the fifth Commissioner actually voted, all controversy as to the validity of the injury question would have been avoided. See 432 F.Supp. at 209 n. 5, 78 Cust.Ct. at 136, n. 5.[23] Again, the *Voss* case is totally irrelevant here.

### Date for the Imposition of Countervailing Duties

█ The court having determined that imports of float glass produced by SIV should be countervailed, there remains the question as to the date for the imposition of such duties in accordance with this decision. Section 516(g) of the Tariff Act of 1930, as amended (19 U.S.C. § 1516(g)) provides:

> If the cause of action is sustained in whole or in part by a decision of the United States Customs Court or of the United States Court of Customs and Patent Appeals, merchandise of the character covered by the published decision of the Secretary, which is entered for consumption or withdrawn from warehouse for consumption after the date of *publication* of the court decision, shall be subject to appraisement, classification, and the assessment of duty in accordance with the final judicial decision in the action, and the liquidation of entries covering the merchandise so entered or withdrawn

shall be suspended until final disposition is made of the action, whereupon the entries shall be liquidated, or if necessary, reliquidated in accordance with the final decision. [Emphasis added.]

Plaintiffs relying on 73 C.J.S. *Publication* (1951) note that the word "publication" means making public; making known to the public; making available for public scrutiny. Thus, plaintiffs argue that as used in section 516(g), the term "publication" can only refer to the making available to the public of court decisions—i. e., the filing or entry of court orders and opinions, and does not mean "reporting" or "printing" in an unspecified journal or reporter. Defendant, on the other hand, contends that "publication" means publication by the Secretary of the Treasury in the Customs Bulletin.

In the only section 516(d) case which has been decided to date, *Zenith Radio Corporation v. United States*, 430 F.Supp. 242, 78 Cust.Ct. 59, *supra*, this court ordered the assessment of countervailing duties on entries made on or after the day following the date of entry of the court's order. 11 Cust. Bull. No. 19, at 79. On appeal, the government challenged (1) this court's determination that a bounty or grant had been bestowed, and (2) this court's order that countervailing duties be assessed on entries made on or after the day following entry (rather than publication in the Customs Bulletin) of this court's decision. The Court of Customs and Patent Appeals reversed on the first issue but specifically declined to reach the second issue. *United States v. Zenith Radio Corporation*, 562 F.2d 1209, 64 CCPA at 133, n. 8. The two dissenting judges in *Zenith* did reach the issue and expressed agreement with the government's position, stating (562 F.2d at 1236, 64 CCPA at 163–164):

> Section 257 of 28 U.S.C. provides that all decisions of the Customs Court shall

---

**23.** Subsequently, the court was advised that the Commission, after careful consideration, chose to stand by its original vote and corresponding determination on injury. Thereafter, the court held that the Commission's determination of injury was procedurally valid. 432 F.Supp. 205, 78 Cust.Ct. 130.

be filed and be open to inspection and that the Secretary shall *publish* weekly such decisions as he or the court may designate and abstracts of all other decisions. Thus, the statutes distinguish between filing or entry of a decision and *publication* thereof, which obviously would not occur simultaneously with the filing or entry. Until January 4, 1967, publication was in "Treasury Decisions." Effective January 4, 1967, the name was changed to "Customs Bulletin" (31 Fed. Reg. 16580). [Emphasis in original.]

Although appellee argues that "publication" means "making available to the public," which would occur upon the filing or entry of court orders and decisions, I am satisfied that the word "publication" in section 516(g) and the word "publish" in section 257 are in pari materia; further, that acquiescence by Congress in the Secretary's practice of carrying out its mandate in section 257 creates a presumption of Congressional approval of that practice. Appellee has provided no evidence clearly showing Congressional disapproval of that practice.

However, as has been noted, the majority of the Court of Customs and Patent Appeals expressed neither agreement nor disagreement with that aspect of this court's order pertaining to the effective date for assessment. Nor did the Supreme Court reach the issue.

I must respectfully disagree with the dissenting judges of the appellate court in their interpretation of section 516(g) and conclude that the three-judge panel of this court was correct, for the following reasons:

First, one cannot properly impute the intent of publication in the weekly Customs Bulletin when Congress merely said "publication." When Congress meant "published [publication] in the weekly Customs Bulletin [Treasury Decisions]" it said so. See 19 U.S.C. § 1516(b); 19 U.S.C. § 1315(d). One cannot draw any inference from 28 U.S.C. § 257 with respect to 19 U.S.C. § 1516(g).

24. The term "publication of the court's decision" in 19 U.S.C. § 1516(g) *clearly refers to* decisions of the Court of Customs and Patent

Section 257 does not mention the Customs Bulletin at all, and neither that section nor any other statute refers to the publication of customs decisions of this court, the Court of Customs and Patent Appeals or the Supreme Court in any periodical.[24]

Second, the legislative history of 19 U.S.C. § 1516(g), which we now consider, clearly demonstrates that "publication" was not intended to mean "publication in the weekly Customs Bulletin."

Section 516(b) of the Tariff Act of 1930, as originally enacted, provided for the suspension of liquidations of imported merchandise while an American manufacturer's protest was being litigated in the Customs Court. 46 Stat. 687. Thus, if American manufacturers were successful in litigation, the effect of any judgment reached back to those importations made during litigation.

However, the Treasury Department was of the view that certain American manufacturers were abusing this vehicle—i. e., were filing protests in order to inject uncertainty into importers' affairs, and the Department supported legislation which was to become the Customs Administrative Act of 1938, 52 Stat. 1077, and which amended section 516 by introducing the language now in issue.

At the hearings before the Ways and Means Committee, the Treasury Department representative explained the purpose of the proposal (which spoke of "publication of the court's decision"), as follows (Hearings before the House Ways and Means Committee on H.R. 6738, 75th Cong., 1st Sess. 99 (1937)):

The present amendment will not in any way preclude the domestic manufacturer, wholesaler, or producer from carrying his protest from the Secretary's decision as to classification or duty rate to the customs courts. All it will do is eliminate as far as possible the protracted period of suspension of liquidation during which importers do not know what duties they are going to have to pay.

Appeals and the Supreme Court as well as this court.

The amendment incorporated in section 15 of the present bill provides that the decision of the Secretary of the Treasury, adverse to the complainant, will remain in effect; that is, that imports may be imported or withdrawn from warehouse at the existing duty rate *until the first decision of the customs courts, whether it be the lower or the upper court, adverse to the Secretary's decision. If the customs court hands down a decision adverse to the Secretary's decision, that would make, of course, a prima-facie case for the merits of the domestic manufacturer's, wholesaler's, or producer's position.* And then prospectively, and prospectively only, the higher duty rates come into effect, but they will not be retroactive, as they are at present, for periods running up to 3½ years, during which the liquidation of all entries of merchandise involved in any such protest is suspended. *In other words, the results of a successful domestic protest will apply only to importations subsequent to a judicial ruling sustaining the protest and not, as at present, to importations made in some cases several years prior to such a ruling.* [Emphasis added.]

The Ways and Means Committee reported out the bill stating, with respect to the relevant section: "Under the new law importers may import their merchandise upon payment of duties in accordance with Treasury findings until a prima-facie case against the correctness of such findings is made by a judicial decision adverse to the Treasury's findings. H.R.Rep.No.1429, 75th Cong., 1st Sess. 4 (1937).

While the Senate Finance Committee also approved the proposal, that Committee introduced an amendment to give American manufacturers' protests "a preferred status on the dockets of the customs courts." S.Rep.No.1465, 75th Cong., 3d Sess. 9–10 (1938). At the Senate-House conference, the House receded, H.R.Rep.No.2677, 75th Cong., 3d Sess. 7 (1938), and the proposed amendment to expedite became law. [This is now codified in 28 U.S.C. § 2633 and § 2602.]

. What is clear from the foregoing is that (1) Congress wished to correct the situation under which importations could be subjected to extended periods of uncertainty during American manufacturers' litigation; (2) in resolving this situation, Congress was mindful of the diminution of American manufacturers' rights—i. e., the benefit of a favorable judgment would no longer be applicable to importations made during litigation; (3) Congress contemplated application of the American manufacturers' claimed rate of duty on entries, once there was a prima facie showing of correctness—a favorable court decision; and (4) Congress, in wishing to preserve and protect American manufacturers' rights, now that decisions in American manufacturers' cases could no longer reach merchandise entered while litigation in the trial court was pending, directed that American manufacturers' litigation be treated expeditiously. The foregoing demonstrates that Congress did not wish to have American manufacturers' rights lessened further by requiring them to wait three to four weeks after a favorable decision—a prima facie that their claim was just—before benefitting therefrom.[25]

Third, whenever Congress requires publication in the weekly Customs Bulletin (or Treasury Decisions) it is for the purpose of providing a certain grace period to affected

---

**25.** Pertinent also are the following comments of the House Ways and Means Committee with respect to the amendment to the Trade Act of 1974 allowing judicial review of negative countervailing duty determinations (H.R.Rep.No.93–571, 93d Cong., 1st Sess. 77 (1973)):

Following the first judicial decision not in harmony with the Secretary's decision, liquidation of all entries of the subject merchandise subsequent to that decision is suspended pending a final judicial decision. If that deci-

sion is sustained on appeal, the merchandise concerned is subject to appraisement, classification, or assessment of duty in accordance with the final decision and effective as of the day after the date of the first judicial decision. The same procedure will be followed in cases involving negative countervailing duty determinations wherein the court will determine whether or not a bounty or grant is being paid or bestowed on the merchandise in question.

members of the public. Thus, 19 U.S.C. § 1315(d) provides:

No administrative ruling resulting in the imposition of a higher rate of duty or charge than the Secretary of the Treasury shall find to have been applicable to imported merchandise under an established and uniform practice shall be effective with respect to articles entered for consumption or withdrawn from warehouse for consumption prior to the expiration of thirty days after the date of publication in the weekly Treasury Decisions of notice of such ruling; but this provision shall not apply with respect to the imposition of antidumping duties or the imposition of countervailing duties under section 1303 of this title.

Similarly, 19 U.S.C. § 1516(b), which harmonizes with § 1315(d), provides:

If, after receipt and consideration of a petition filed by an American manufacturer, producer, or wholesaler, the Secretary decides that the appraised value of the merchandise is too low, that the classification of the article or rate of duty assessed thereon is not correct, or that countervailing duties or antidumping duties should be assessed, he shall determine the proper appraised value or classification, rate of duty, or countervailing duties, or antidumping duties and shall notify the petitioner of his determination. Except for countervailing duty and antidumping duty purposes, all such merchandise entered for consumption or withdrawn from warehouse for consumption more than thirty days after the date such notice to the petitioner is published in the weekly Customs Bulletin shall be appraised or classified or assessed as to rate of duty in accordance with the Secretary's determination. For countervailing duty purposes, the procedures set forth in section 1303 of this title shall

apply. For antidumping duty purposes, the procedures set forth in section 160 of this title shall apply.

Under these statutory provisions, before the rate of duty or value is increased, importers will have an opportunity to enter goods, which on the date of publication are on the high seas or under contract to purchase. The passage of thirty days between the announcement of the new rate or value in the Customs Bulletin and the effective date of the new administrative ruling is consistent with this statutory plan.

However, "[the] publication of the court decision" in section 516(g) is not for the purpose of establishing a grace period. The decision becomes effective the date after (*not* thirty days after) publication. If the first notice of an increased duty liability to the importers is the reporting of a decision in the Customs Bulletin, clearly Congress did not intend to afford importers time to enter previously ordered merchandise (or merchandise in transit) at the pre-existing rate of duty. The clear purpose of section 516(g), unlike the "change of practice" provisions, is to establish a cut-off date, i. e., the date on which entries become susceptible to a court decision.

From what has been said, it follows that interpretation of the term "publication" in section 516(g) does not mean "publication in the Customs Bulletin." Rather, it is concluded that this court's reading of section 516(g) implicit in its order in *Zenith* was correct and should be followed in this case.

### Conclusion and Order

In view of all the foregoing, the court holds that the payment or bestowal of the grants in question upon the manufacture or production of float glass in Italy by SIV are bounties or grants within the ambit of the countervailing duty law.[26]

---

26. For the reasons set forth in this opinion, I must respectfully disagree with the decision of Judge Ford in *ASG Industries, et al. v. United States,* C.D. 4782, *supra,* holding that bounties or grants on float glass produced in West Germany were not countervailable on the ground that they did not tend to distort international

trade. Similarly, I must respectfully disagree with the decision of Judge Landis in *ASG Industries, et al. v. United States,* C.D. 4788, *supra,* holding that benefits extended to a British float glass producer under a British regional development program did not constitute bounties or grants on the basis that the Secretary of

It is therefore ordered that plaintiffs' motion for summary judgment be granted and that defendant's cross-motion for summary judgment be denied.

It is further ordered that the Secretary of the Treasury (1) ascertain and determine or estimate the net amount of the bounties or grants paid or bestowed upon the manufacture or production of float glass in Italy by SIV; and (2) direct the appropriate customs officers throughout the United States to assess countervailing duties thereon, in said net amount equal to the said bounties or grants, entered or withdrawn from warehouse for consumption on or after the day following the date of entry of this order.